UNITED STATES of America,
Plaintiff-Appellant,

Dedra Estell Overton et al.,
Intervenors-Appellants,

v.

TEXAS EDUCATION AGENCY et al.
(AUSTIN INDEPENDENT SCHOOL
DISTRICT), Defendants-Appellees.

No. 73–3301.

United States Court of Appeals,
Fifth Circuit.

Nov. 21, 1977.

Mario G. Obledo, Sanford Rosen, MAL-DEF, San Francisco, Cal., Jim Heidelberg, San Antonio, Tex., Gabriel Gutierrez, Jr., Samuel T. Biscoe, Austin, Tex., Jack Greenberg, Melvyn R. Leventhal, Kellis E. Parker, Sylvia Drew, Bill Lann Lee, New York City, for Overton et al.

William S. Sessions, U. S. Atty., San Antonio, Tex., John L. Hill, Atty. Gen., Austin, Tex., Brian K. Landsberg, Joseph D. Rich, Attys. Dept. of Justice, Washington, D. C., for United States.

Donald S. Thomas, William H. Bingham, Jr., Austin, Tex., for Austin Independent School District.

Before WISDOM, COLEMAN and TJOFLAT, Circuit Judges.

WISDOM, Circuit Judge:

In accordance with the mandate of the Supreme Court in *Austin Independent School District v. United States,* 1976, 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603, we have reconsidered the Austin School case, *United States v. Texas Education Agency,* 5 Cir. 1976, 532 F.2d 380 (*Austin II*), in light of *Washington v. Davis,* 1976, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. We reaffirm our reversal of the district court's judgment.

After restudy of our two earlier decisions and the record, we again hold that the evidence overwhelmingly supports the conclusion that the Austin School Board, Austin Independent School District (AISD), engaged in acts showing a pervasive intent to segregate Mexican-Americans. *Dayton Board of Education v. Brinkman,* —— U.S. ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), however, as we read it, compels the remand of the case for a hearing so that the AISD may submit and the district court approve a tri-ethnic desegregation plan consistent with the decisions of this Court and of the United States Supreme Court.

I.

Seven years after the Attorney General of the United States initiated this tri-ethnic school desegregation suit under the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, it comes to this Court for the third time, this time on remand from the Supreme Court.

In *United States v. Texas Education Agency,* 5 Cir. 1972, 467 F.2d 848 (en banc), *Austin I,* this Court held, with respect to black students, that "the AISD has not dismantled the state-imposed [segregated school] system based on race". The district

court had entered an order approving a plan that closed black secondary schools. The students in those schools were assigned to Anglo secondary schools. This plan scattered blacks of secondary school age through the district, but put the entire burden of transportation on blacks. We held, "The AISD has not fulfilled its 'affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch'". 467 F.2d at 870.

With respect to Mexican-American students, we held that the district court was clearly erroneous in finding that the AISD had not practiced segregation against that identifiable ethnic minority. We held that through various actions AISD officials "caused and perpetuated the segregation of Mexican-American students within the [Austin] school system". 467 F.2d at 865–866. We ordered that the school system "be converted to a unitary system on a tri-ethnic, desegregated basis". 467 F.2d at 871. The en banc court of fourteen was unanimous in holding that AISD intentionally discriminated against Mexican-Americans and was divided only as to how desegregation should be accomplished.

On remand, the district court was at a disadvantage in carrying out the mandate in *Austin I* in view of the decision of a majority of our Court rejecting a motion to clarify the remedy (the vote was nine to five).[1] 5 Cir., 470 F.2d 1001. The district court also had to consider the Supreme Court's supervening decision in *Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. The district court reiterated its earlier holding that "the AISD . . . has engaged in discriminatory assignment of black students to promote segregation". The court ordered the black high school and junior high school closed, again throwing the burden of busing only on the blacks.

The district court held that its finding of past intentional segregation of blacks constituted a prima facie case of intentional segregation of Mexican-Americans. It concluded, however, that the AISD had rebutted this prima facie case by demonstrating that there was no intentional discrimination against Mexican-American students. Nevertheless, the court included them in the limited desegregation remedy it approved for blacks. That remedy was to desegregate *one grade in the black elementary schools*—the sixth—leaving segregation untouched in the district's other grades and schools. Mexican-American children were left in their segregated facilities, except for those who attended the Sixth Grade Center. The district court approved certain worthy bilingual and bicultural programs.

■ The unique limitation on desegregation to the sixth grade in black schools, which the AISD proposed and was approved by the district court, raises a fair inference that the AISD intended to continue extensive segregation of Mexican-Americans. The AISD suggests that the 1974 Education Amendments, 20 U.S.C. § 1701 *et seq.* (1976 Supp.), somehow support this blanket exclusion. There are two answers to this contention. First, as the AISD in its own brief correctly observes:

"the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States." 20 U.S.C. § 1702(b).

Second, the 1974 amendments do not support the wholesale exclusion of entire grades from a desegregation plan. They merely "find" that "the risks and harms created by *excessive* transportation are particularly great for children enrolled in the first six grades". 20 U.S.C. § 1702(a)(5)

---

1. The record shows that the district judge said to the attorneys, in regard to the majority's opinion on remedy: "I assume that all of you have read the opinion. I hope that you know more about it than I do . . . . [t]hen you, Judge Bell or the majority opinion coming along saying that the only way you can proceed under *Swann* is to ferret out by schools the proscribed segregation. If you can help out any, I sure would appreciate it, about that sort of thing, what they mean by that thing".

(emphasis added). This legislation does not purport to prohibit desegregation of children at such grade levels, but points out the obvious; as the Supreme Court said in *Swann v. Charlotte-Mecklenburg Bd. of Ed.,* 402 U.S. 1, 31, 91 S.Ct. 1267, 28 L.Ed.2d 554, age is one factor in evaluating the "practicalities" of a transportation plan.

In *United States v. Texas Education Agency,* 5 Cir. 1976, 532 F.2d 380 (*Austin II*), the district court's finding of *de jure* discrimination against blacks was not appealed. We again reversed the district court's holding that the AISD had not subjected Mexican-American students to intentional discrimination. We held that the plaintiffs had made out an unrebutted prima facie case of segregation of Mexican-American students. We further held that the Sixth Grade Plan—part time desegregation for some—was "constitutionally insufficient". We instructed the district court to "draft a comprehensive tri-ethnic desegregation plan" that would "conform to one of the approaches outlined by Dr. Finger in his written submission of August 14, 1972, and in his testimony". 532 F.2d at 399. (Dr. Finger was the court-appointed expert in *Swann.*) The Finger Plan, submitted by the Mexican-American intervenors, envisioned the conversion of the Austin school system to a 4–4–4 or a 5–3–4 grade structure in which all students "in elementary schools that are over 50 percent minority would be bused to elementary schools that are over 90 percent Anglo", and middle school students "in schools that are over 90 percent Anglo would be bused to schools that are over 50 percent minority". 532 F.2d at 395. High school integration would be accomplished "by selecting, for each high school, feeder schools that would maximize the integration of that high school". *Id.*

The AISD petitioned for a writ of certiorari. The United States, in its brief on certiorari, had doubts about this Court's rationale in *Austin II,* but contended that the judgment was correct in holding "that the AISD engaged in pervasive acts of discrimination against Mexican-Americans". The Supreme Court granted certiorari, vacated our decision, and remanded the case to us "for reconsideration in light of *Washington v. Davis.*" We now review our decision in *Austin II* in light of this mandate.

II.

We note at the outset, our determination that the AISD practiced intentional discrimination against black students is not in issue; the AISD did not appeal the district court's finding to this effect in *Austin II.* 532 F.2d at 392. Moreover, because *Washington v. Davis* is concerned with the evidentiary showing necessary to establish an equal protection violation in those situations where there has been no law specifically requiring segregation, that decision is inapplicable "where a statutory dual system has ever existed", *Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. 189, 201, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548, 559.[2] Our concern here, therefore, is with the effect of *Washington v. Davis* on our holding that the AISD unconstitutionally discriminated against Mexican-American students.

In *Washington v. Davis* the Supreme Court held that otherwise neutral state action does not violate the fourteenth amendment's equal protection clause "solely" because it has a disproportionate impact on a racial minority. Instead, courts must "adhere to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory

2. Such statutory dual educational systems are unconstitutional per se under *Brown v. Board of Education,* 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. A school board is under an affirmative duty to convert a dual school system to a unitary system. *Swann v. Charlotte-Mecklenburg Board of Education,* 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554; *Alexander v. Holmes County Board of Education,* 1969, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19; *Green v. County School Board, of New Kent County,* 1968, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 16; *Brown v. Board of Education,* 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

purpose[3]". 426 U.S. at 240, 96 S.Ct. at 2048. The use of the word "solely" was clarified by Mr. Justice White, organ of the Court. He was careful to point out that a racially disproportionate effect may be an important evidentiary consideration in evaluating whether state action was discriminatorily motivated.

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. . .
> Disproportionate impact is not irrelevant, but it is not the sole touchstone of invidious racial discrimination forbidden by the Constitution.

426 U.S. at 242, 96 S.Ct. at 2049.

More recently, in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 1977, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, upholding the constitutionality of a local zoning decision that had a disproportionate effect on blacks, the Supreme Court elaborated upon its holding in *Washington v. Davis* by detailing evidentiary guidelines under which the discriminatory intent requirement of *Washington v. Davis* could be satisfied. Mr. Justice Powell, for the Court, carefully noted that *Washington v. Davis* "does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes". (Emphasis added). 429 U.S. at 97 S.Ct. at 563. In his opinion he stated:

> The impact of the official action—whether it 'bears more heavily on one race than another,' *Washington v. Davis*, 426 U.S. at 242 [96 S.Ct. 2040]—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.
> . . .
> The historical background of the decision is [another] evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. . . The specific sequence of events leading up the challenged decision also may shed some light on the decisionmaker's purposes. . . . Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.

429 U.S. at 266–67, 97 S.Ct. at 564.

In *Austin II*, as will be discussed more fully, we referred to the neighborhood assignment system as neutral on its face, but observed that all of the evidence showed that the AISD resorted to that system only when it would produce the maximum feasible separation of Anglos from Mexican-Americans. When it did not, the AISD resorted to gerrymandering, dual-overlapping zones, discriminatory school siting and capacity decision (tailoring the design, location, and size of a school to fit only a racial or ethnic group), and other discriminatory devices. The package demonstrated a pervasive intent to discriminate against Mexican-Americans.

The principle that plaintiffs challenging official action as racially or ethnically discriminatory must show the existence of a purpose or intent to discriminate was foreshadowed in *Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548, three years before our decision in *Austin II.* In writing *Austin II* we were conscious of the Court's statement in *Keyes,* "We emphasize that

---

**3.** This principle seems to be the key to an understanding of *Washington v. Davis.* It is a key, however, that does not readily turn in all locked school doors. As Justice Stevens observed in his concurring opinion, "the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume". 426 U.S. at 254, 96 S.Ct. at 2054.

the differentiating factor between *de jure* segregation and so-called *de facto* segregation . . . is purpose or intent to segregate." (Emphasis in original.) 413 U.S. at 208, 93 S.Ct. at 2697. The essential element of *de jure* segregation is "a current condition of segregation resulting from intentional state action". 413 U.S. at 205, 93 S.Ct. at 2696. The Court in *Keyes*, however, did not explicate whether the discriminatory intent necessary to make out an equal protection violation in school desegregation cases was to be determined (a) under a subjective standard, which would require a court to determine whether the official decisionmakers harbored a subjective desire to segregate or discriminate[4] or (b) under an objective standard, by which the official decisionmakers would be held to have intended the reasonably foreseeable consequences of their decisions.[5]

We understand the difficulties inherent in employing a subjective intent test to determine whether school board authorities practiced impermissible *de jure* segregation against minority students.[6] In *Austin II*, therefore, we adopted an objective test for ascertaining discriminatory intent and "incorporat[ed] in school segregation law the ordinary rule of tort law that a person intends the natural and foreseeable consequences of his actions". 532 F.2d at 388.[7]

4. As one commentator has observed:

Some of the language in the *Keyes* majority opinion can be read to endorse the interpretation that 'segregative intent' refers to the subjective motivation of individual school officials. According to the *Keyes* majority, the Denver school authorities' actions were 'deliberate' and 'purposeful'; '*purpose or intent*' was said to distinguish de jure from de facto segregation. Similarly, the Court held that proof of segregative intent with respect to one area of Denver left the school authorities with the burden of showing that their actions in other areas of the city 'were not also *motivated* by segregative intentions'.

Note, Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction, 86 Yale L.J. 317, 321–322 (1976) (*emphasis in original*).

5. The principle that an actor is held to intend the reasonably foreseeable results of his actions is firmly rooted in the common law of torts. *See, e. g.*, W. Prosser, The Law of Torts § 8 (4th ed. 1971); Restatement (Second) of Torts § 8A, Comment b (1965).

6. In *Austin II* we observed:

[I]t is difficult—and often futile—to obtain direct evidence of the official's intentions. Rather than announce his intention of violating antidiscrimination laws, it is far more likely that the state official "will pursue his discriminatory practices in ways that are devious, by methods subtle and illusive—for we deal with an area in which 'subtleties of conduct . . . play no small part' ".

532 F.2d at 388. *Accord, United States v. Board of School Commissioners of Indianapolis, Ind.*, 7 Cir. 1973, 474 F.2d 81, 88. Justice Stevens, in his concurring opinion in *Washington v. Davis*, provided another reason why an official's personal motivation is an area of inquiry that is generally tangentially probative at best in evaluating whether a school board has practiced *de jure* segregation.

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation. It is unrealistic, on the one hand, to require the victim of alleged discrimination to uncover the actual subjective intent of the decisionmaker or, conversely, to invalidate otherwise legitimate action simply because an improper motive affected the deliberation of a participant in the decisional process. A law conscripting clerics should not be invalidated because an atheist voted for it.

426 U.S. at 253, 96 S.Ct. at 2054. *See Dayton Board of Education v. Brinkman*, —— U.S. ——, ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (Stevens, J., concurring). For a further critique of the use of a subjective intent test in school desegregation cases, *see* Note, Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction, 86 Yale L.J. 317, 322–327 (1976); remarks of Professor Owen Fiss at the Second Circuit Judicial Conference (1976), reported in 74 F.R.D. 276, 280.

7. This result was further compelled, we reasoned, by the fact that

in *Monroe v. Pape*, 1961, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492, 505, the Supreme Court rejected the argument that specific intent is a necessary element of the cause of action under 42 U.S.C. § 1983, the statute under which many school desegregation cases are brought. The Court held that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions".

In reading the "natural and foreseeable consequences" test into the necessary requirement of segregative intent (*Washington v. Davis*), this Circuit stands not alone, but in company with four other circuits. *Hart v. Community School Board of Education, New York School District # 21*, 2 Cir. 1975, 512 F.2d 37, 50–51 (a well articulated decision); *Morgan v. Kerrigan*, 1 Cir. 1974, 509 F.2d 580, 588, *affirming Morgan v. Hennigan*, D.Mass.1974, 379 F.Supp. 410, 478, cert. denied, 1975, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449; *Oliver v. Michigan State Board of Education*, 6 Cir. 1974, 508 F.2d 178, 181–182, *cert. denied*, 1974, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449; *Bradley v. Milliken*, 6th Cir. 1973, 484 F.2d 215, 222, aff'd in relevant part, 1974, 418 U.S. 717, 738 n. 18, 94 S.Ct. 3112, 41 L.Ed.2d 1069, 1087 n. 18 (adopting district court's reliance on "natural and predictable effect" school board policies). *Cf. United States v. Board of School Commissioners of Indianapolis, Ind.*, 7 Cir. 1973, 474 F.2d 81, 84–85, *cert. denied*, 1973, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041.

In neither *Washington v. Davis* nor *Arlington Heights* did the Supreme Court directly confront the issue of what type of official intent—subjective or objective—a plaintiff must show to present a prima facie case of impermissible racial or ethnic discrimination or segregation under the fourteenth amendment's equal protection clause. *Washington v. Davis* and *Arlington Heights* did establish that the disproportionate racial impact of the neutral application of a long-standing neutral policy, by itself, will rarely constitute a constitutional violation. Those decisions thus partly answered in the affirmative, one of the questions left open in *Keyes* —"whether a neighborhood school policy of itself will justify racial or ethnic concentrations, in the absence of a finding that school authorities have committed acts constituting *de jure* segregation".[8] We are well aware that some official actions on which a plaintiff hinges an allegation of unconstitutional discrimination have historically been motivated by racially and ethnically neutral *bona fide* concerns, such as the desire to have children attend the school closest to their home, and no showing is made that those concerns were actually subordinate to, or a subterfuge for, unconstitutional discrimination. In those circumstances, that a discriminatory result was the natural and foreseeable consequence of the actions is insufficient to infuse the challenged acts with the type of discriminatory intent required by *Washington v. Davis* and *Arlington Heights*. Nevertheless, we emphasize that we do not read *Washington v. Davis* and *Arlington Heights* as banishing from the law of racial and ethnic discrimination the venerable common law tort principle that a person intends the natural and foreseeable consequences of his actions. When the official actions challenged as discriminatory include acts and decisions that do not have a firm basis in well accepted and historically sound non-discriminatory social policy, discriminatory intent may be inferred from the fact that those acts had foreseeable discriminatory consequences. As a practical matter, in school desegregation cases we can envision few official actions, other than the decision to use a neighborhood school policy for student assignment, that would not be subject to the "natural foreseeable consequences" rule.[9]

We went on to
find no inconsistency between the rule applied in *Monroe v. Pape* and that applied in *Keyes*, nor . . . any reason for applying a standard different from *Monroe v. Pape* in school desegregation cases.
*Austin II*, 532 F.2d at 389.

8. *Keyes v. School District No. 1, Denver, Colorado*, 1973, 413 U.S. 189, 212, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548.

9. As this Court recognized in *United States v. Jefferson County Board of Education*, 5 Cir. 1966, 372 F.2d 836, 879, *aff'd en banc*, 1967, 380 F.2d 385, *cert. denied*, 1967, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103, "The neighborhood school system is rooted deeply in American culture". In *Deal v. Cincinnati Board of Education*, 6 Cir. 1966, 369 F.2d 55, 60, the Sixth Circuit summarized the sound policy reasons for the adoption and maintenance of a neighborhood school system.

The presumption is especially probative in assessing the official intent behind such affirmative school board decisions as those concerning school locations, the construction and renovation of schools, the closing of schools, the drawing of student attendance zones, and the assignment of faculty and staff.[10]

There is language in our *Austin II* opinion that an official discriminatory intent adequate to support a finding of *de jure* segregation could be inferred solely from the school board's use of a neighborhood school policy for student assignment.[11] To the extent that *Austin II* can be so read, it is inconsistent with *Washington v. Davis* and *Arlington Heights*. The Supreme Court recognized this ambiguity in vacating our decision and remanding the case to us.

In *Austin II*, however, we analyzed the cause and effect test used in *Austin I*, which was the same test applied in our earlier decision in *Cisneros v. Corpus Christi Independent School District*, 5 Cir. 1972, 467 F.2d 142 (en banc), *cert. denied*, 1973, 413 U.S. 920, 93 S.Ct. 3053, 37 L.Ed.2d 1041. In light of *Keyes*, we expressly rejected the argument of the Mexican-American intervenors that *Keyes* did not establish that segregative intent is a *necessary* element of unconstitutional school segregation. We held, quoting from *Morales v. Shannon*, 5 Cir. 1975, 516 F.2d 411, 412–13, *cert. denied*, 1975, 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408, that "[W]ith respect to the first issue, segregatory intent, we are governed by *Keyes* . . . which supervenes our holding in *Cisneros* . . . to the extent that *Keyes* requires as a prerequisite to a decree to desegregate a de facto system, . . . proof of segregatory intent as a part of state action". *Austin II*, 532 F.2d 380, 387. But it was apparent to us in both

---

The neighborhood system is in wide use throughout the nation and has been for many years the basis of school administration. This is so because it is acknowledged to have several valuable aspects which are an aid to education, such as minimization of safety hazards to children in reaching school, economy of cost in reducing transportation needs, ease of pupil placement and administration through the use of neutral, easily determined standards, and better home-school communication.

In his separate opinion in *Keyes v. School District No. 1, Denver, Colorado*, 1973, 413 U.S. 189, 246, 93 S.Ct. 2686, 2716, 37 L.Ed.2d 548, Justice Powell elaborated on a further desirable aspect of a neighborhood school policy.

> Neighborhood school systems, neutrally administered, reflect the deeply felt desire of citizens for a sense of community in their public education. Public schools have been a traditional source of strength to our Nation, and that strength may derive in part from the identification of many schools with the personal features of the surrounding neighborhood. Community support, interest, and dedication to public schools may well run higher with a neighborhood attendance pattern: distance may encourage disinterest.

**10.** Nothing in *Washington v. Davis* or *Arlington Heights* is inconsistent with inferring a discriminatory intent from a school board's *refusal* to take action to ameliorate segregation. *See Austin II*, 532 F.2d at 389.

**11.** We had in mind the misuse of a neighborhood school policy:

At least in the Texas schools, where we have held that Mexican-American students are entitled to the same benefits of *Brown* as are blacks, school authorities may not constitutionally use a neighborhood assignment policy that creates segregated schools in a district with ethnically segregated residential patterns. A segregated school system is the foreseeable and inevitable result of such an assignment policy. When this policy is used, we may infer that the school authorities have acted with segregative intent.

532 F.2d at 392. We also said:

> It has been the AISD's policy to assign students to the schools closest to their homes. The City of Austin, with the exception of the strip between East and West Austin, has ethnically segregated housing patterns. Hence, the natural, foreseeable, and inevitable result of the AISD's student assignment policy has been segregated schools throughout most of the city. Moreover, as we found in *Austin I*, "[a]ffirmative action to the contrary would have resulted in desegregation". 467 F.2d at 863. The inference is inescapable: the AISD has intended, by its continued use of the neighborhood assignment policy, to maintain segregated schools in East and West Austin. The plaintiffs have therefore established a prima facie case of *de jure* segregation of Mexican-Americans in all portions of the school district except the residentially integrated central city area.

532 F.2d at 390 (footnotes omitted).

*Austin I* and *Austin II* that the AISD historically had used neighborhood schools to accentuate and to perpetuate segregation of blacks and Mexican-Americans, and that it was attempting now to absolve itself of responsibility for increasing segregation by taking shelter in a supposed neutral policy of assigning students to neighborhood schools. As the United States argued, "When [a neighborhood school] policy has been used in concert with obvious tools of discrimination, it may come to partake of a discriminatory quality and to be an instrument of discrimination itself." Brief for the United States, p. 9.

Our finding of discriminatory intent in *Austin II* was not predicated "solely" on the AISD's use of a neighborhood student assignment policy. We thought that we had made this clear in concluding:

> As articulated in *Austin I*, the case before us presents not only the use of a neighborhood assignment policy in a residentially segregated school district, but also the taking of an extensive series of actions dating back to the early twentieth century that had the natural, foreseeable, and avoidable result of creating and maintaining an ethnically segregated school system.

532 F.2d 392. *Austin* is not just a case of a school board's inaction or failure to reduce segregation because of the force of residential patterns unrelated to official board action. Here the school authorities produced more racial and ethnic separation in the schools than in the residential patterns of the district as a whole.[12] Nevertheless, to dispel any doubt that may remain, we again set forth the findings that compel our conclusion that the AISD intentionally discriminated against Mexican-American students, adding to racial and ethnic separation.

## III.

### A. The segregation of Mexican-Americans in the AISD schools.

■ We observed in Austin II that "[t]he statistics paint a clear picture of the extensive segregation that still exists in the Austin schools". 532 F.2d at 390.[13] Although *Arlington Heights* cautioned that "[a]bsent a pattern as stark as that in *Gomillion [v. Lightfoot*, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110] or *Yick Wo [v. Hopkins*, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220], impact alone is not determinative, and the Court must look to other evidence[14]", the Court stated that "[t]he impact of the official action . . . may provide an im-

---

**12.** We held [the en banc decision]
"that the AISD has, in its choice of school site locations, construction and renovation of schools, drawing of attendance zones, student assignment and transfer policies, and faculty and staff assignments, caused and perpetuated the segregation of Mexican-American students within the school system."
467 F.2d at 865–66. We also found that "[t]he natural and foreseeable consequence of these actions was segregation of Mexican-Americans." 467 F.2d at 863. The Supreme Court inferred segregative intent from the same kind of circumstantial evidence in *Keyes. See* 413 U.S. at 192, 93 S.Ct. 2686. The inference of segregative intent that the Supreme Court made regarding the Denver school authorities is equally applicable to their counterparts in Austin. In its memorandum opinion and order of February 2, 1976, the district court, citing Justice Powell's separate opinion in *Keyes*, 413 U.S. at 226 and 240–41, 93 S.Ct. 2686, declined to approve the construction of the proposed Southwest High School and

Northeast Junior High School because the proposed schools would accentuate the desegregation problems in the district.

**13.** In so finding, we confirmed the district court's finding that there was substantial segregation of Mexican-Americans in the Austin school system, *Austin II*, 532 F.2d at 389. The court found, however, "an absence of segregatory intent or purpose toward Mexican-Americans".

**14.** *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 1977, 429 U.S. at 266, 97 S.Ct. at 564. (Footnotes omitted). *See Dayton Board of Education v. Brinkman*, 1977, —— U.S. ——, ——, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851: "The finding that the pupil population in the various . . . schools is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board."

portant starting point[15]", in analyzing whether a discriminatory intent existed.

The AISD's report to the district court for the period ending January 15, 1977, indicates that the "clear picture of . . . extensive segregation" we discerned in *Austin II* has not faded. Of the 58,664 students attending all of Austin's schools, 60 percent (35,342) are Anglo, 16 percent (9,378) are black, and 24 percent (13,933) are Mexican-American. Almost 40 percent of the AISD's Mexican-American students attend schools that have a minority enrollment of greater than 90 percent. On the high school level, 65.2 percent of the district's 17,973 students are Anglo, 14.4 percent (2,584) are black, and 20.4 percent (3,668) are Mexican-American. While 54 percent of the Mexican-American high school students attend schools that are greater than 58 percent minority, nearly two-thirds of the Anglo high school students attend schools that are greater than 78 percent Anglo. Mexican-American students fare no better in the junior high schools. Forty-seven percent of them attend either Allan Jr. High or Martin Jr. High, which are 99 percent minority and 97 minority respectively. Of the AISD's 30,275 elementary school students, 58 percent (17,692) are Anglo, 17 percent (5,122) are black, and 25 percent (7,461) are Mexican-American. Over 46 percent of the Mexican-American elementary school children attend elementary schools that have minority enrollments ranging from 91 to 100 percent; and 55 percent of the Anglo elementary school children attend schools that are over four-fifths Anglo. Of the school district's 61 elementary schools, only 23 have enrollments that are not over 80 percent Anglo or 80 percent minority.

Admittedly, the AISD's neighborhood school policy played no small part in creating and maintaining this pattern of Mexican-American segregation in the Austin schools. This is not a case, however, in which "the 'neighborhood school concept' has . . . been maintained free of manipulation". *Keyes v. School District No. 1, Denver, Colorado*, 1973, 413 U.S. 189, 212, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548. Instead, an examination of school board decisions on such matters as the construction and abandonment of schools, the selection of school sites, the assignment of faculty and staff, and the drawing of student attendance zones confirms the existence of the segregative intent that the statistics imply.

B. *The historical background of official actions taken for segregative purposes.*

Pre-*Brown*,[16] the AISD established "Mexican" schools, just as it established "black" schools. The AISD now says that Mexicans are whites and, of course, they usually are. But the Mexican schools had all Mexican-American enrollments; few Mexican-Americans were assigned to Anglo schools. The AISD maintained the segregated identity of the schools through the use of dual-overlapping attendance zones, student assignment policies, teacher assignment policies, school site selection, and gerrymandering. The evidence clearly showed the school board's intent to segregate Mexican-American students.[17] In dual-overlap-

---

**15.** *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. at 266, 97 S.Ct. at 564.

**16.** *Brown v. Board of Education*, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873; 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

**17.** The district court, in its decision of August 1, 1973, that was the subject of our review in *Austin II*, concluded that these actions were not indicative of a segregative intent on the part of the AISD because "the existence of these schools represented no more than a humane and compassionate attempt by the School District, using educational techniques then accepted as proper and progressive, to meet the special educational needs of children who would otherwise have been much more severely handicapped in their efforts to obtain an education". The district court, however, erred in assuming that there could be no discriminatory intent where segregative actions were prompted by what at the time was thought to be benign motive. As we held in *Austin I*, 467 F.2d at 869, and reiterated in *Austin II*, 532 F.2d at 391,

we are not convinced that, to meet the special educational needs of Mexican-American children, the AISD had to keep these children in separate schools, isolate them in Mexican-

ping zones Anglos attended Anglo schools; Mexican-Americans attended Mexican schools. The AISD built new schools deep inside Mexican-American neighborhoods, with a capacity keyed to serving only the Mexican-Americans. We recount those actions as they were set forth in *Austin I.*

> Evidence at trial . . . reveals the existence of an all-Mexican-American school, West Avenue, as early as 1916. West Avenue shared a dual-overlapping zone with Pease, an all-white school. Whites within the zone went to Pease, and Mexican-Americans attended West Avenue. West Avenue continued to operate as a Mexican-American school until it was closed in 1947. Canal [Comal] Street School was opened in 1924. School Board minutes reflect that the school was built to accommodate Mexican-American students attending three other schools. These three schools were the only schools in the district with more than twenty Mexican-Americans.
>
> In 1934, West Avenue and Canal [Comal] Street enrolled 45 percent of the district's Mexican-American students; Bickler had about 25 percent and Metz about 15 percent. After the passage of a bond issue Zavala school opened. The site for the new school was three blocks from the Mexican-American Canal [Comal] Street school which was then closed. Zavala shared a dual-overlapping zone with Metz, one of two predominately white schools with significant numbers of Mexican-American students. Mexican-Americans were expected to and did attend Zavala; whites attended Metz. This is unadulterated segregation. West Avenue and Zavala, predominately Mexican-American, were the only schools in the district which shared zones with other schools. By 1940, West Avenue and Zavala enrolled 56 percent of the AISD's Mexican-American students. Also at the time Zavala was built in 1935, Bickler, the other predominately white school with a significant number of Mexican-American students, was discontinued as an elementary school, and Bickler students were sent to other schools. It is unclear as to where these students went, although some were reassigned to Winn, Palm, and Metz (Zavala). In 1939, a committee from Winn complained of the assignment of Mexican-American students from Bickler to Winn. Soon thereafter, some of these students were reassigned to Bickler.

467 F.2d at 866–867 (footnote omitted).

### C. *The post-Brown sequence of events indicating intentional racial discrimination.*

Post-*Brown* decisions by the AISD pertaining to school construction and abandon-

---

American neighborhoods, or prevent them from sharing in the educational, social, and psychological benefits of an integrated education. . . . A benign motive will not excuse the discriminatory effects of the school board's actions.

*Accord: Keyes v. School District No. 1, Denver, Colorado,* 10 Cir. 1975, 521 F.2d 465, 480, *cert. denied,* 1976, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (holds that "although bilingual instruction may be required to prevent the isolation of minority students in a predominantly Anglo school system . . . such instruction must be subordinate to a plan of school desegregation"). *See McNeal v. Tate County School District,* 5 Cir. 1975, 508 F.2d 1017, disapproving ability groupings within schools that result in segregated classrooms where ability groupings are a product of a previously segregated school system. Furthermore, as the Mexican-American and black intervenors assert, "[i]t is difficult . . . to see how the segregation of Spanish-speaking children into schools and classrooms where teachers were forbidden by [Texas state] law to speak Spanish and instruction was provided in English only could have resulted from 'benign' motivation". Reply Brief of Mexican-American and Black Intervenors to Supplemental Brief Filed by the AISD at 7.

Because the district court's misapprehension of the law infected its ultimate conclusion that the AISD did not intentionally subject Mexican-American students to discrimination with an erroneous legal standard, our review of the district court's findings is not governed by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *Manning v. M/V "Sea Road",* 5 Cir. 1969, 417 F.2d 603, 607. Even under the "clearly erroneous" rule, we are convinced that the district court's finding that the AISD did not intentionally discriminate against Mexican-American students would warrant reversal.

ment and teacher assignment further evince the existence of a segregative intent on the part of the school board. "In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is . . . a factor of great weight." *Swann v. Charlotte-Mecklenburg Board of Education,* 1971, 402 U.S. 1, 21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554, 569. *See Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. 189, 201–202, 93 S.Ct. 2686, 37 L.Ed.2d 548.

In *Austin I* we observed the following discriminatory pattern which infected both elementary and secondary public schools:

In 1953, O'Henry Junior High School opened in the western section of Austin. At that time the zone line for Allan Junior High School, a predominately Mexican-American facility, was moved so that many whites were zoned out of Allan and into O'Henry. In 1956, Allan Junior High burned down. The new Allan Junior High School was built on the same site as the old school and opened in 1957 with 75 percent Mexican-American enrollment. In addition, the Allan Zone line was moved so that fewer whites were included in the new zone.

In 1960, the new Johnston High School was opened in East Austin [the predominately Mexican-American section of Austin]. The suggestion for a central location for this facility was rejected, and the school was built deep in a Mexican-American area. It opened with a 78 percent Mexican-American enrollment. In 1967, University Junior High School was closed because the University of Texas re-

claimed the property where the school was located. Martin Junior High School was built in the heart of the Mexican-American community. Again, centrally-located sites for the new facility were considered and rejected. Martin opened with 77 percent Mexican-American enrollment. White students who had formerly attended University Junior High School were zoned to predominately-white junior high schools rather than to Martin.

The elementary school zone lines have remained static in East Austin during the years following *Brown.* As a result, the schools have become increasingly overcrowded as the school population increased. Several new elementary schools have been built to relieve overcrowded conditions in areas outside of East Austin. In the seven predominately-Mexican-American schools in East Austin portable classrooms have been supplied, instead.

467 F.2d at 867 (footnote omitted).[18]

■ The AISD further demonstrated its intent to segregate Mexican-Americans by assigning the district's small number of Mexican-American teachers and other professional staff to schools with predominately Mexican-American student enrollments. In *Swann,* the Supreme Court cautioned that, "[i]ndependent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff . . . a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown". 402 U.S. at 18, 91 S.Ct. at 1277.[19]

---

**18.** At the time of *Austin I,* "[t]he 39 predominately white elementary schools outside of East Austin [had] a total of 44 portable classrooms; the seven Mexican-American schools in East Austin [had] a total of 24 portables". *Austin I,* 467 F.2d 867 n.32. This disproportionate use of portable classrooms instead of new school construction to alleviate overcrowding in predominately Mexican-American schools may itself be indicative of a discriminatory intent. *See Armstrong v. Brennan,* 7 Cir. 1976, 539 F.2d 625, 631, vacated and remanded for reconsideration in the light of *Village of Arlington*

*Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Dayton Board of Education v. Brinkman,* —— U.S. ——, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), —— U.S. ——, 97 S.Ct. 2907, 53 L.Ed.2d 1044.

**19.** Although the Swann Court spoke only in terms of "Negro" and "white" schools, it is established "that Hispanos [Mexican-Americans] constitute an identifiable class for purposes of the Fourteenth Amendment". *Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. at 197, 93 S.Ct. at 2691. We

We found in *Austin I* that, in 1971, "[s]ixty-five percent of the Mexican-American high school teachers, 36 percent of the Mexican-American junior high school teachers, and 77 percent of the Mexican-American elementary teachers [were] assigned to predominately Mexican-American schools". 467 F.2d at 868. Although no Austin school had a majority of Mexican-American faculty members, and these figures would not, by themselves, suffice to prove the AISD's intent to discriminate, they constitute another stroke in an evidentiary picture that all too clearly shows the school board's intent to discriminate against Mexican-Americans.

The plans adopted in 1955 and in the 1960's for the desegregation of black schools primarily allowed black students to transfer to Mexican-American schools but not to Anglo schools. Mexican-Americans were invariably assigned to black schools but not to Anglo schools. Ironically, the AISD argues that this policy was benign; it was to allow Mexican-Americans to be with their Spanish-speaking friends and their neighbors. But the teachers, by law, were forbidden to speak Spanish; instruction was only in English!

■ We find that the evidence demonstrates that the segregation of Austin's Mexican-American students was pervasive and intentional. We find it unnecessary, therefore, to determine whether absent this

evidence the plaintiffs could nevertheless have made out a prima facie case of ethnic discrimination by relying on one or both of the presumptions announced by the Supreme Court in *Keyes*.[20] *See Austin II*, 532 F.2d at 390–391 n.14.

### IV.

We have concluded for the third time, that the AISD intentionally discriminated against Mexican-Americans; that the district court applied an erroneous legal standard in assuming that there could not be discriminatory intent when the actions were prompted by what was thought at the time to have been a benign motive; that the district court's finding as to intent was erroneous. Our reconsideration of the case in light of *Washington v. Davis* complies with the mandate of the Supreme Court.

The Supreme Court's recent decision in *Dayton Board of Education v. Brinkman*, —— U.S. ——, 97 S.Ct. 2766, 53 L.Ed. 851 (1977) requires us again to remand the case to the district court for a hearing. In *Dayton*, the Court specifically addressed the question of "the proper allocation of functions between the district courts and the courts of appeals within the federal system"[21], and instructed that once a constitutional violation is found in a school desegregation case,

> the District Court in the first instance, subject to review by the Court of Ap-

believe that faculty segregation is especially probative of a school board's intent to discriminate because of the high degree of control school boards exercise over such matters as faculty placement. *See United States v. School District of Omaha*, 8 Cir. 1975, 521 F.2d 530, 538 n.13, *cert. denied*, 1975, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280; *Kelly v. Guinn*, 9 Cir. 1972, 456 F.2d 100, 107.

**20.** The first presumption is that "proof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system". 413 U.S. at 203, 93 S.Ct. at 2695. In tri-ethnic school districts such as Austin's, proof that one minority group was subject to statutorily enforced segregation will thus support a presumption that the other minority group was also subject to the same dual school system. The school board can overcome this

presumption by showing that "the geographical structure of, or the natural boundaries within, a school district may have the effect of dividing the district into separate, identifiable and unrelated units". *Id.* The second presumption is that "even if it is determined that different areas of the school district should be viewed independently of each other", "a finding of intentionally segregative school board actions in a meaningful portion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious". 413 U.S. at 208, 93 S.Ct. at 2697. In a tri-ethnic setting, this means that a finding that intentional segregation was practiced against one minority group raises the presumption that any segregation suffered by the second minority group was intentional.

**21.** —— U.S. at ——, 97 S.Ct. at 2770.

peals, must determine how much incremental segregative effect these violations had on the racial distribution of the . . . school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a systemwide impact may there be a systemwide remedy. (Emphasis added.) —— U.S. at ——, 97 S.Ct. at 2775.

■ Assessing the incremental segregative impact of a school board's discriminatory actions and policies is not an easy task. The district court, on remand, must take into account that

[p]eople gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

*Swann v. Charlotte-Mecklenburg Board of Education,* 1971, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554. The burden of demonstrating that the residential concentration of minorities in East Austin is unrelated to the AISD's segregative school poli-

cies is to be shouldered by the school board. *See Keyes v. School District No. 1, Denver, Colorado,* 1973, 413 U.S. at 211 n.17, 93 S.Ct. 2686.

■ "[T]he burden of state officials is that set forth in *Swann*—to take the necessary steps 'to eliminate from the public schools all vestiges of state-imposed segregation'. 402 U.S. at 15." *Milliken v. Bradley,* —— U.S. ——, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977). The remedy, of course, must be tailored to fit the nature of the violation.[22] If the district court finds that the incremental segregative effects of the AISD's intentional actions discriminating against Mexican-Americans have a systemwide impact on the racial distribution of the Austin school population, then the scope of the remedy must also be systemwide. In assessing the extent of the impact, the district court should keep in mind the Supreme Court's statement in *Keyes* that "racially inspired school board actions have an impact beyond the particular schools that are the subjects of those actions."[23] 413 U.S. at 203, 93 S.Ct. at 2695. The partial desegregation of a single grade has no basis in logic or in equity as a remedy suited and sufficient to rectify the constitutional deprivations inflicted by segregating school

**22.** The standard set by *Swann* is "that the scope of the remedy is determined by the nature and extent of the constitutional violation." 402 U.S. at 16. *Milliken II* explains: "The well-settled principle that the nature and scope of the remedy is to be determined by the violation means simply that federal court decrees must directly address and relate to the constitutional violation itself. . . . [W]here, as here, a constitutional violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the *'condition'* that offends the Constitution." (Emphasis supplied.) *Milliken v. Bradley,* —— U.S. ——, 97 S.Ct. 2758.

**23.** In devising an appropriate plan, it seems to us important for the AISD and the district court to bear in mind that in the setting of a school case the plaintiffs are not just aggrieved individuals; they represent the "collective will." *Hart v. Community School Board,* 2 Cir. 1975, 512 F.2d 37. "Segregation is a group phenomenon . . . [A]s a group wrong . . . the mode of redress must be group-wide to be adequate." Note, 20 U.Chi.L.Rev. 577 (1953). *See also,* Meador, The Constitution

and the Assignment of Pupils to Public Schools, 45 Va.L.Rev. 517, 523 (1959). What we said in *Jefferson* about blacks applies equally to Mexican-Americans in certain states: "Negroes collectively are harmed when the state, by law or custom, operates segregated schools or a school system with uncorrected effects of segregation. Denial of access to the dominant culture, lack of opportunity in any meaningful way to participate in political and other public activities, the stigma of apartheid condemned in the Thirteenth Amendment are concomitants of the dual educational system. The unmalleable fact transcending in importance the harm to individual Negro children is that the separate school system was an integral element in the Southern State's general program to restrict Negroes as a class from participation in the life of the community, the affairs of the State, and the mainstream of American life: Negroes must keep their place." *United States v. Jefferson County Board of Education,* 1966, 5 Cir., 372 F.2d 836 at 866, *aff'd on reh. en banc* 380 F.2d 385, *cert. denied,* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103.

children. It is an affront to *Brown, Green v. New Kent, Alexander v. Holmes, Swann, and Keyes*,[24] to say nothing of this Court's long and consistent record of affording minorities an opportunity to enter the mainstream of American life by affording them an equal opportunity with whites for an education.

The district court should give the hearing on remedy a high docket priority. All parties should be free to introduce such additional testimony and other evidence as the district court may consider appropriate. All remedial measures currently in effect shall remain in effect pending the district court's decision on remedy.

---

**24.** See citations in fn. 1. "[T]his Court has, with limited exceptions, disapproved of school board plans which exclude a certain age group-ing from school desegregation." *Arvizu v. Waco Independent School District*, 5 Cir. 1974, 495 F.2d 499, 503.