**Tyrnn SMILEY et al., Plaintiffs,**

v.

**Frank VOLLERT et al., Defendants.**

**Civ. A. No. 2643.**

United States District Court,
S. D. Texas,
Galveston Division.

June 16, 1978.

---

1. Hearing of December 27, 1977, at Tr. 11.

2. Opinion of June 3, 1977 at 2.

3. Hearing of December 27, 1977, at Tr. 12.

4. Id. at Tr. 13.

Weldon H. Berry, Houston, Tex., for plaintiffs and intervenors.

Bryan F. Williams, Jr., Royston, Rayzor, Vickery & Williams, Galveston, Tex., Edward H. Schwab, III, Bedford, Lambdin & Schwab, Galveston, Tex., for defendants.

Joseph D. Rich, U. S. Dept. of Justice, Washington, D. C., Jeremiah Glassman, U. S. Dept. of Justice, Washington, D. C., Paulina Jacobo, U. S. Dept. of Health, Education & Welfare, Dallas, Tex., amicus curiae.

COWAN, District Judge.

### ORDER OF JUNE 16, 1978

*Brief History of Case and Essential Facts*

This case seeking desegregation of the Galveston Independent School District (GISD) was filed on August 18, 1959. On January 23, 1961, the Court entered an order instituting a "stair-step," year-at-a-time, freedom-of-choice desegregation order similar to the orders entered in many courts in that era. GISD exceeded the schedule established in the order of January 23, 1961.

The case then lay dormant for over 14 years.

During this 14-year period, the high school grades (9, 10, 11 and 12) were totally integrated by the establishment of a single, centrally located high school. Ball High has become a totally integrated, multi-ethnic educational institution where any child of any race can receive as fine an education as his own motivations, talents and energy permit. Without court interference, GISD has totally integrated its eighth grade—by the establishment of one central eighth grade, which has also (the Court is advised by the Court's Tri-Ethnic committee) become a successful, totally integrated, multi-ethnic school which is a credit to this pluralistic community. The middle schools (grades 6, 7, and 8) have also been totally and fully integrated.

In the protracted history of this litigation none of the parties has ever contended that the faculty or administration of GISD has not been effectively integrated.

This case was reactivated on May 23, 1975 by GISD's filing a document entitled "Defendant, School District's Motion (1) to Substitute Parties Defendant; (2) to Implead Additional Defendants; (3) for Leave to Plead for Injunctive and/or Declaratory Relief and, alternatively, for Modification of the Court's Existing Order; and (4) to Suggest the Appointment of New or Additional Representative Parties." The principal event which precipitated the reactivation of this ancient case was a dispute between GISD and the Department of Health, Education and Welfare (HEW) concerning ethnic disproportions in three elementary schools (Carver-Goliad-Washington), located in the central portion of the City of Galveston and the effect which the disproportion had upon GISD's entitlement to ESAA funds.

The controversy between GISD and HEW was ultimately submitted to this Court, resolved at the district court level, and is currently the subject of an appeal to the Fifth Circuit Court of Appeals. The GISD–HEW controversy was severed by the court order on May 26, 1976 and admin-

istratively is carried here as Civil Action No. G–2643A. This case is carried as Civil Action No. G–2643.

This opinion does not purport to address itself to the still pending controversy between GISD and HEW but relates entirely to issues raised by plaintiffs' action in connection with a school construction program (authorized by a bond issue passed by voters of GISD in 1975) and with the issues which must be resolved before this litigation may ultimately be terminated. Plaintiffs have asserted that GISD should be restrained from using the new facilities until a satisfactory plan is adopted for the elimination of all vestiges of the previously segregated system in the elementary school system.

After the new schools, which are currently in construction, are completed, the three schools, Washington-Carver-Goliad, will be abandoned. Washington is already closed. A large, very modern new school—L. A. Morgan—will be located in the general area where Washington-Carver-Goliad were previously located. GISD will then have six elementary schools: Alamo, Burnet, Morgan, Parker, Rosenberg, and San Jacinto *. It is projected that during the 1978–79 school year, each of these elementary schools will have the following racial mix:

GISD ELEMENTARY SCHOOL MEMBERSHIP PROJECTED: 1978–79
(Prepared April 1978)

| | | K | 1 | 2 | 3 | 4 | 5 | Total | % |
|---|---|---|---|---|---|---|---|---|---|
| ALAMO | AA | 21 | 22 | 18 | 25 | 15 | 31 | 132 | 24.76 |
| | NA | 40 | 43 | 39 | 24 | 33 | 32 | 211 | 39.58 |
| | MA | 32 | 35 | 30 | 29 | 27 | 37 | 190 | 35.64 |
| | TOTAL | 93 | 100 | 87 | 78 | 75 | 100 | 533 | |
| BURNET | AA | 32 | 37 | 55 | 45 | 48 | 36 | 253 | 38.21 |
| | NA | 42 | 45 | 37 | 55 | 34 | 53 | 266 | 40.18 |
| | MA | 26 | 28 | 26 | 17 | 21 | 25 | 146 | 21.60 |
| | TOTAL | 100 | 110 | 118 | 117 | 103 | 114 | 662 | |
| MORGAN | AA | 10 | 12 | 7 | 8 | 9 | 9 | 55 | 7.19 |
| | NA | 90 | 91 | 105 | 77 | 95 | 105 | 565 | 73.69 |
| | MA | 30 | 29 | 19 | 22 | 24 | 22 | 146 | 19.10 |
| | TOTAL | 130 | 132 | 131 | 107 | 128 | 136 | 764 | |
| PARKER | AA | 83 | 87 | 93 | 106 | 87 | 88 | 544 | 72.05 |
| | NA | 18 | 18 | 18 | 17 | 21 | 29 | 121 | 16.02 |
| | MA | 14 | 15 | 17 | 10 | 18 | 16 | 90 | 11.92 |
| | TOTAL | 115 | 120 | 128 | 133 | 126 | 133 | 755 | |

* One geographically isolated school—Bolivar Elementary—is not involved in the controversy. Its ethnic identifiability is conceded to be the result of residential patterns.

GISD ELEMENTARY SCHOOL MEMBERSHIP PROJECTED: 1978-79
(Prepared April 1978)

| | | K | 1 | 2 | 3 | 4 | 5 | Total | % |
|---|---|---|---|---|---|---|---|---|---|
| ROSENBERG | AA | 30 | 32 | 37 | 42 | 28 | 37 | 206 | 32.80 |
| | NA | 26 | 28 | 28 | 21 | 30 | 24 | 157 | 25.00 |
| | MA | 45 | 46 | 47 | 40 | 48 | 39 | 265 | 42.19 |
| | TOTAL | 101 | 106 | 112 | 103 | 106 | 100 | 628 | |
| SAN JACINTO | AA | 18 | 20 | 25 | 31 | 16 | 24 | 134 | 22.37 |
| | NA | 60 | 63 | 43 | 47 | 61 | 49 | 323 | 53.92 |
| | MA | 27 | 29 | 23 | 21 | 22 | 20 | 142 | 23.70 |
| | TOTAL | 105 | 112 | 91 | 99 | 99 | 93 | 599 | |
| DISTRICT | AA | 194 | 210 | 235 | 257 | 203 | 225 | 1324 | 33.595 |
| | NA | 276 | 288 | 270 | 241 | 274 | 292 | 1641 | 41.639 |
| | MA | 174 | 182 | 162 | 139 | 160 | 159 | 976 | 24.765 |
| | TOTAL | 644 | 680 | 667 | 637 | 637 | 676 | 3941 | |

*Prior Orders, Hearings and Issues Remaining*

Since the filing of plaintiffs' motion relating to the new schools, this Court has entered orders which were filed or announced in open court upon the following dates: September 9, 1977, March 1, 1978 and April 27, 1978. These orders are incorporated by reference herein and for the purposes of publication, distribution to the Tri-Ethnic committee, the parties and interested members of the public will be appended to this order as Exhibits A, B and C.

This Court has conducted hearings September 6–9, 1977, and on December 1, 1977, January 10, 1978, March 24, 1978, April 21, 1978, May 5, 1978 and June 2, 1978.

Through its Board GISD has elected to remove all vestiges of the previous segregated system by implementing new transfer and minority-to-majority transfer programs, and by making the new L. A. Morgan school, which will commence operation in September, 1978, into a magnet school which will (because of the excellence of its programs and its staff) attract students of all races.

Frank Vollert, Superintendent of Schools, has testified that it is his goal to create a situation at Morgan whereby the racial ratio at that school will be approximately that of the elementary school population of the entire district. Mr. Vollert and Jewel Banks, the principal of the new school, have testified persuasively that the Board has given and is giving its full support and approval—both moral and financial—to this goal. The Court has invited the GISD Board to attend the meetings of this Court's Tri-Ethnic Committee and the Board has done so; and the individual Board members have, in the presence of counsel, communicated with the Court and its Tri-Ethnic Committee.

The Court finds that the GISD Board has adopted Mr. Vollert's stated goal. The Court is also persuaded, and specifically holds, that the goal is a realistic one and can be achieved within the foreseeable future.

Six issues remain for decision. They are:

1. What time schedule should be established for achievement of the goal with reference to the Morgan school?

2. Should siblings of children who qualify for special instructional programs be exempted from GISD's transfer program so that a family with two or more elementary school children may place all elementary children in one school?

3. What programs should be instituted at the Morgan school to enable it to achieve the goal described by Mr. Vollert?

4. What type of "back-up" plan should be mandated or planned in the event the magnet school at L. A. Morgan does not achieve its goal of creating an integrated school?

5. When should this Court schedule a hearing to determine whether GISD may properly be decreed to have achieved unitary status?

6. What questions must be explored at the hearing contemplated by question 5 above?

*Schedule for Achievement of Goals*

■ The Supreme Court and the Fifth Circuit Court of Appeals have steadfastly insisted that every school district which previously operated a segregated system has an affirmative duty to take all steps practicable to eliminate all vestiges of the previously existing system "root and branch" now. (See "Discussion of Recent Authorities" below on page 16).

■ The courts have, however, emphasized three other important principles:

1. Study of the court's insistence in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) upon the use of "effective tools" and analysis of *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) persuaded this Court that the Court should favor remedies which tend, if possible, to create permanent—not just temporary—integration.

2. The remedy prescribed must be appropriate to the specific constitutional violation found. *Pasadena City Board of Education v. Spangler, supra.*

3. The courts must balance the individual interest with the collective interest. *Milliken v. Bradley*, 418 U.S. 717, at 738, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

4. School districts and courts must take all reasonable steps to minimize avoidable abrasions and dislocations. See *Lemon v. Bossier Parish School Board*, 566 F.2d 985, at 989 (5th Cir. 1978).

■ This Court is persuaded that the best chance of making Morgan a permanently integrated school is through the magnet school approach. Court-compelled pairing and associated busing, which are constitutionally required in some circumstances, have not always produced the desired results. It is authoritatively recognized in this circuit that pairing and associated compulsory busing are not remedies of first resort. *Lemon v. Bossier Parish School Board*, 566 F.2d 985, at 989 (5th Cir. 1978).

GISD has argued that to make the Morgan school work, it will be required to employ and train a specially qualified faculty, expend considerable funds and institute programs designed to attract Anglo-American and Mexican-American children to Morgan. GISD contends persuasively (and plaintiffs and amicus do not seem to dispute) that GISD must have some period of stability to accomplish this program. Amicus (HEW) does not challenge or contest the proposition that GISD, to make its magnet programs work, must be given some period to institute its program, train and employ a special faculty, educate parents and children concerning the advantages of the new school, and work out the unforeseeable problems incident to any new enterprise. Amicus and plaintiffs argue for a two-year period—a period supported by some but not all of the GISD Board members.

GISD's counsel argues that it should be given a four-year period of stability. Plain-

tiffs and intervenors are properly emphatic in their insistence that the program not take forever. Amicus HEW argues, on the basis of the experience in Richardson, Texas, that the shorter the period prescribed, the better the chances for success.

The Court after hearing arguments from the parties and after detailed consultation with the Tri-Ethnic Committee has determined the following schedule (as a standard for *minimum* performance) will be instituted:

By September 1978, the student body at Morgan shall, insofar as possible and practicable, meet GISD's projection filed with the Court at the hearing of April 21, 1978, that is: Anglo-American, 7.19%; Negro-American, 73.69%; Mexican-American 19.1%.

By March 1, 1979, the percentage of Black-American pupils at Morgan shall not exceed 65%—the remaining 35% of the student population will be approximately equally divided between Anglo-American and Mexican-Americans.

By March 1, 1980, the percentage of Black-American pupils at Morgan shall not exceed 55%—the balance of the student population will be approximately equally divided between Anglo-Americans and Mexican-Americans.

By September 30, 1981, the percentage of Black-American pupils at Morgan shall not exceed 50%—the balance of the student population will be approximately equally divided between Anglo-Americans and Mexican-Americans.

It is, of course, obvious that GISD must strive to achieve the goal enunciated by Superintendent Vollert more rapidly than the schedule set forth above and that this schedule is a standard of minimum performance. In addition, demographic changes in the student population of GISD could modify these figures. GISD obviously complies with the law if it achieves a racial mix at Morgan that is essentially identical to that of the population of elementary pupils in GISD. This racial mix may well change from year to year.

This Court's reasoning with reference to this schedule is as follows:

Any schedule of this nature is to some degree arbitrary because there is no objective standard to apply. The inherent arbitrariness is slightly mitigated by giving all parties and interested citizens an opportunity to be heard. GISD's request for a period of stability is conceded by all parties to have some merit. The debate centers merely around the *period* of stability.

The evidence before the Court as to the periods of time necessary in other magnet programs is as follows: Judge Max Taylor required the Richardson Independent School District to achieve integration in its magnet school in a *two week* crash program, and this challenge was the impetus which made the program a success.

On the other hand, the Martin Luther King Laboratory School in Evanston, Illinois—which is to some degree a model for the Morgan school—apparently took seven years to achieve its integration goal.

The Court has attempted to balance the evidence, the recognized competing interests and the arguments of the parties in establishing this time-table. The March 1, 1979 and March 1, 1980 dates have been selected because if the goals set for these dates are not met, sufficient time remains to implement new, different plans for the following September.

In requiring this time-table, this Court is aware that the Court has no authority to decree that these percentages shall remain fixed and immutable forever. See *Pasadena City Board of Education v. Spangler, supra.* This Court does, however, have both the power and the absolute obligation under the law as enunciated in this circuit to require that these percentage goals be achieved as an initial step toward achievement of unitary status. See cases discussed below and particularly *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. at 24, 91 S.Ct. 1267. This is true, in part, because the so-called Vollert Plan, a plan for pairing and busing, has been held by this Court (on the basis of adequate evidence) to be a practicable plan which would,

if implemented, probably immediately eliminate Morgan as an identifiably black school.

■ The statement set forth in the last sentence of the previous paragraph is, however, only probably true—not certainly true. There is always a possibility that if pairing and the associated busing were decreed, the vast majority of the white students subjected to forced busing would exit the system. While it is true that fear of "white flight" cannot serve as an excuse for failing to integrate a school system, it is also true that " . . . the district judge or school authorities should make every effort to achieve the greatest possible degree of *actual* desegregation and will thus necessarily be concerned with the elimination of one race schools." *Swann*, 402 U.S. at 26, 91 S.Ct. at 1281. One-race schools cannot be eliminated if the entire district evolved into a one race or two race district. Refusal to face this possibility would be blindness. Realistic evaluation of possibilities demands recognition of the fact that effective re-segregation by Anglo-American abandonment of the public schools has occurred in other communities. See *Calhoun v. Cook*, 522 F.2d 717 (5th Cir. 1975).

Candor requires the recognition of one other consideration. The history of this district since 1970, and other districts in other parts of our nation, reveals that it may become virtually impossible to eliminate all vestiges of the previously existing dual system if voters are so disgruntled with their public schools that they refuse to continue to approve an adequate tax base and adequate financing. Carver-Goliad-Washington were *physical* vestiges of the dual system. Their physical elimination became possible only because voters of *all* ethnic groups were willing to approve a bond issue in 1975 which had previously been rejected in 1971 and 1973. Without the new facility at Morgan and widespread public support for the public schools, talk about eliminating the vestiges of the prior desegregated system would be merely talk and real results would be impossible.

*Appropriateness of Remedy and Schedule in Light of Constitutional Violation*

This Court's first duty in a case of this nature is to identify the specific constitutional violation. See *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). The specific constitutional violation here arises from this history:

In 1969 the GISD Board adopted a neighborhood school assignment program that would have achieved some degree of racial balance at all of the elementary schools in the district. The plan, insofar as it related to Goliad, Washington and Carver schools did not work. As the 70's progressed, it was apparent that those schools became more and more racially identifiable as black schools. Mr. Edwards, a long-time member of the school Board and a totally credible witness, testified that when he became a Board member in 1973, the physical facilities at Goliad, Washington and Carver were run down, test scores at those schools were low, and the community perception was that these schools were inferior.

The ability of the Board to grapple with the problem presented by Goliad-Carver-Washington schools was limited by several factors.

*First,* the failure of proposed bond elections in 1971 and 1973.

*Second,* during the early 1970's the Board was receiving conflicting messages from the various branches of the federal government. See discussion in *Kelley v. Metropolitan County Board of Education, Tenn.,* 372 F.Supp. 528, at 543, 545 (M.D.Tenn.1973); see also Defendants' Exhibits 13 and 15B in this record.

*Third,* the Board, it appears to the Court, has at various times been simply too divided to take effective action.

*Fourth,* the Board has not always had an accurate perception of its legal obligations with reference to the Carver-Goliad-Washington problems.

These difficulties made it hard for the Board to grapple with the problem of the Carver-Goliad-Washington schools and per-

haps impossible for it to totally solve these problems; but these difficulties, great as they were, did not make it impossible to at least grapple with and attempt to solve the problem.

The ability of the Board to solve the problem presented by the adjacent Goliad-Carver-Washington schools increased enormously in 1975 when the voters finally approved a bond issue which made it fiscally possible to abandon the antiquated Goliad-Washington-Carver complex and build a magnificent new school at the Morgan site. The promotion and successful implementation of this bond issue was a great, positive step forward and has made it possible for the Board to move forward at last with a positive program to eliminate these schools and their successor as vestiges of the old segregated system.

Justice Powell has wisely stated in his concurring opinion in *Austin Independent School District v. U. S.*, 429 U.S. 990, at 994, 97 S.Ct. 517, at 519, 50 L.Ed.2d 603 (1976) that violations can occur because:

. . . school authorities intentionally discriminated against minorities or *simply failed to fulfill affirmative obligations to eliminate segregation.* (Emphasis added).

Applying Justice Powell's language to this case, this Court now (as it was in September 1977) is persuaded that GISD's Board has not at any material time discriminated intentionally against any minority. The successful integration of the high school, the middle schools, and the bulk of the elementary schools militates too strongly against an intent to discriminate.

The Board has, however, fallen constitutionally short through failure, in Justice Powell's language " . . . to fulfill affirmative obligations to eliminate segregation." From 1970 until the relatively intensive and effective action commencing in April 1978, the Board has not taken all steps practicable to eliminate segregation in the Carver-Washington-Goliad elementary schools. Were it not for the assertions of plaintiffs and Amicus here, it is likely that Morgan when its operation commenced in September 1978, would have simply been a merger of the students, the faculties and the problems of the Goliad-Carver-Washington schools. The constitutional violation is, this Court finds, clear.

█ In addition, there is one other factor which militates against intentionally segregative action. The Board could well have concluded in good faith (although this Court thinks erroneously) that the racial mix at the Goliad-Carver-Washington schools was the result of residential patterns over which the Board had no control. The problem with such an approach is that the Board has a heavy burden to prove that the racial mix at the Carver-Washington-Goliad schools was the result of residential patterns. This burden has not been met.

Chief Justice Burger, in *Swann*, in April 1971, used the following applicable language:

. . . in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominantly of one race, they have the burden of showing that such school assignments are genuinely non-discriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

402 U.S. 1, at 26, 91 S.Ct. 1267, at 1281.

█ In addition, the facts (established by GISD's own witness Edwards) that the physical facilities, test scores and possibly the teaching staffs at Goliad-Carver-Washington were inferior or perceived by the community to be inferior, establishes that the Board did not from 1970 to April 1977 meet its duty to do everything practicable

" . . . to fulfill (its) affirmative obligations to eliminate segregation." The Supreme Court (through Justice Burger in *Swann*) spelled out a varied assortment of tools, strategies and possible actions to eliminate the vestiges of a dual system. GISD's Board has not, from 1970 until the last few weeks, availed itself of these tools (with reference to the Carver-Goliad-Washington problem) in an effective, aggressive manner—therein lies the constitutional violation.

In view of the success of GISD in integrating the high school, the middle schools and the majority of the elementary schools without court compulsion, and the Court's conclusion that the failure with reference to the Goliad-Washington-Carver schools is not the result of intentionally discriminatory action, it seems particularly appropriate that GISD be given an opportunity to desegregate Morgan by voluntary measures before mandating a remedy of final resort, i. e., pairing and associated busing.

## MONITORING

This Court and its Tri-Ethnic Committee will monitor the progress of GISD toward achieving unitary status in the following manner.

On the first Friday of each month at 12:00 noon (or such other time as may be set by the Tri-Ethnic Committee) the Court will, in the sixth floor courtroom of the U.S. Courthouse and Post Office Building, conduct a hearing to hear evidence concerning the progress of GISD. The Court will hear testimony from Mrs. Jewel Banks, Superintendent Vollert and such other witnesses as may be necessary to keep the Court and the Tri-Ethnic Committee fully advised concerning GISD's progress toward unitary status. The Court is advised that GISD is employing consultants to aid in the Morgan school magnet program. At an appropriate time, after the consultants have become acquainted with the facts of this effort, the Court will hear testimony from these consultants.

This Court is committed to afford GISD a period of stability to accomplish the Morgan School program, but if it appears to the Court, after full consultation with the parties, Amicus, and the Tri-Ethnic Committee, that progress is unsatisfactory, the Court reserves the right at any time—after notice and hearing—to enter such additional and supplemental orders as may be necessary.

In addition, if it should appear from competent evidence—after notice and hearing—that the magnet school approach is not making real and substantial progress toward the creation of an integrated school at Morgan, the Court will be obligated to require the institution of a back-up plan of the type discussed in general terms below.

### Recent Authorities Discussed

Study of five cases decided by the various panels of the Fifth Circuit Court of Appeals in the last six and one-half months reveal that there is little room for present debate as to the applicable law. As indicated above, one of the factors which has limited the Board's effectiveness in dealing with the Carver-Goliad-Washington problem has been uncertainty and largely futile debate about the Board's legal obligation. These recent five cases reveal that there is little justification for future debate about the law's demands.

On November 21, 1977, Circuit Judges Wisdom, Coleman and Tjoflat handed down their third opinion in *United States v. Texas Education Agency (Austin III)* 564 F.2d 162 (5th Cir. 1977). While the facts in *Austin III* are arguably distinguishable, it is notable that the Austin district's proposed segregation plan was found wanting because segregation in the first five grades of certain elementary schools was left untouched. Institution of worthy bilingual and bi-cultural programs was held inadequate to meet the Board's obligations. The panel held that where the natural and foreseeable result of Board action was to permit continued racial isolation of a large number of elementary school children, segregative intent by the Board would be conclusively presumed. The Fifth Circuit panel (it is apparent from its language) still favors a desegregation plan which Justice Powell de-

scribes as "remarkably sweeping," requiring extensive cross-town busing of all students through eighth grade in schools which were over 50% minority or 90% Anglo.

While this Court is persuaded that GISD's Board in recent years has never been subjectively motivated by discriminatory intent, it is now readily perceivable, and the Court finds (in compliance with the analysis required by *Austin III*), that the natural and probable consequences of the inactivity of the GISD Board in connection with the Carver-Goliad-Washington schools from 1970 until the vigorous activity commencing April 1977 was to create a situation in which the condition of racial isolation at Carver-Washington-Goliad became progressively more marked.

On January 11, 1978, Circuit Judges Goldberg, Clark and Roney decided *Lemon v. Bossier Parish School Board*, 566 F.2d 985 (5th Cir. 1978) which reversed Judge Edwin Hunter's opinion appearing at 442 F.Supp. 935 (W.D.La.1977). *Lemon* is particularly significant for the light which it sheds upon the GISD problem. The district court opinion is the work of Senior District Judge Edwin F. Hunter, Jr., who has been district judge in Lake Charles, Louisiana, for many years. This Court is advised that he has supervised the integration, over a period of many years, of fourteen separate Louisiana Parishes. His experience in this area of endeavor is vast.

A study of Judge Hunter's opinion reveals that Bossier Parish was a large school district, with 18,000 scholastics. Every school in the district was integrated with the exception of Butler elementary school, which was located in an isolated and compact neighborhood. The neighborhood around Butler school was bounded on the south by railroad tracks and heavy industry; on the west by railroad tracks, heavy industry and U.S. Highway 80; on the east by the Louisiana-Arkansas Railroad. Only four streets ran into the area.

Over the years before Judge Hunter's order in March, 1977, a number of efforts had been made to integrate Butler school. At one point the court had ordered that the only kindergarten in the Parish be located at Butler, and during the period that this was true, 168 Anglo-American students attended the kindergarten. As soon as the kindergarten program was established at other schools, all of the white students at Butler disappeared. During the 1973–74 school year, a portion of the Butler attendance zone was rezoned so as to include an area outside the isolated residential district in which Butler was located. This rezoning did not integrate the school.

Ultimately the United States of America, which appeared in that case as an intervenor, filed a motion requesting supplemental relief and requesting the court to order an alternative method of student assignment which would effectively desegregate Butler Elementary School, the only remaining all-black school in Bossier Parish. Judge Hunter appointed a bi-ethnic committee to study the situation, allowed the intervention of a group of Black-American parents and clergymen interested in preserving Butler as a "walk-in neighborhood school." This bi-ethnic committee unanimously recommended that Butler remain as a walk-in, neighborhood school despite the failure of all efforts to integrate the school.

Judge Hunter, after obviously thoughtful deliberation, decided that the existence of this one elementary school serving 158 students in an isolated neighborhood was the result primarily of residential patterns over which the board had no control. Following the recommendation of his bi-racial committee and the Black-American intervenors, he denied the United States' motion for supplemental relief and held that Butler would continue to exist as a neighborhood school despite its Black-American identifiability.

The case for allowing Butler Elementary School to remain an all-black school was considerably stronger than the case which can be made for allowing Morgan to remain an identifiably black school. Butler was located in an isolated area—Morgan is not. Butler served only 158 students in a district containing 18,385 students—Morgan is a considerably larger school, a more integral part of the GISD elementary school pro-

gram. Some previous efforts to integrate the Butler school had been tried and failed. No realistic efforts have ever been made to integrate the Goliad-Washington-Carver schools which are the predecessors of Morgan. The trial court, Judge Hunter, was willing to conclude that Butler's racial identifiability was primarily the result of residential patterns over which the Board had no control—this trial Court, the writer, is here unwilling to draw this conclusion on the basis of the evidence adduced thus far. Judge Hunter's bi-ethnic committee strongly recommended the retention of Butler as a predominantly black school. This Court's Tri-Ethnic Committee has made no such recommendation. The Black-American intervenors (interested parents and clergymen) in *Lemon* strongly recommended the retention of Butler, knowing that it would remain predominantly black—the intervenors here take a contrary view.

The most significant fact is that despite the powerful case which could be made for the retention of Butler as an all-black neighborhood school, the Fifth Circuit Court of Appeals (through a panel consisting of Judges Goldberg, Clark and Roney) reversed Judge Hunter's conclusion that Butler Elementary School could remain as an all-black elementary school in an isolated black neighborhood. The Fifth Circuit panel held forthrightly and without equivocation that Butler must be integrated or closed. Since other desegregation strategies had been tried and failed, it is obvious from the opinions that Butler could be integrated only by either pairing and busing, or by busing white children already transferred to Butler. The Fifth Circuit panel rejected Judge Hunter's conclusion that the racial identifiability was attributable solely to residential patterns and held that despite the isolated, geographic character of Butler, pairing and busing were constitutionally required.

One other significant aspect of *Lemon* should be noted. Judge Hunter had concluded, undoubtedly on the basis of his years of experience, that pairing would not in fact desegregate the Butler school. While his reasoning in this regard is not made explicit by his opinion, it is reasonably obvious that Judge Hunter's reasoning must have been that white students in other districts would drop out of the public school system rather than be bused to Butler. Judge Hunter's conclusion in this regard was rejected by the Fifth Circuit panel, using the following language:

The district court concluded that pairing Butler with nearby Bossier Elementary would not achieve desegregation of the Butler school. This conclusion is clearly erroneous. Our examination of the record indicates that pairing would effectively desegregate Butler Elementary 'without creating impractical attendance zones or inordinate transportation problems.' *Bradley v. Board of Public Instruction of Pinellas County,* 431 F.2d 1377, 1381 (5th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1608, 29 L.Ed.2d 111 (1971). Although pairing might not be the remedy of first resort, 'where all-black or virtually all-black schools remain under a zoning plan, but it is practicable to desegregate some or all of the black schools by using the tool of pairing, that tool must be used.' *Flax v. Potts,* 464 F.2d 865, 868 (5th Cir.), cert. denied, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972), *quoting Allen v. Board of Public Instruction,* 432 F.2d 362, 367 (5th Cir. 1970).

*United States v. South Park Independent School District,* 566 F.2d 1221 (5th Cir. 1978) involved a school district in the Eastern District of Texas in which the United States, as plaintiff, contended that a 1970 desegregation plan was not having its intended result. The principal areas of difficulty were eight predominantly black schools, and a set of facts from which it could be concluded that principals were being assigned upon a racial basis. The Honorable Joe J. Fisher, Chief Judge of the United States District Court for the Eastern District of Texas rejected the government's contentions and held that South Park Independent School District had achieved unitary status. Judge Fisher's finding was reversed by a Fifth Circuit

panel consisting of Judges Coleman, Tjoflat and Fay, primarily on the basis that Judge Fisher's findings of fact with reference to the eight predominantly black schools were not sufficiently specific to enable the Fifth Circuit panel to determine whether in fact the eight all-black schools were the result of residential patterns over which the board had no control, or on the contrary were the result of previously segregative practices.

Judge Fay's language at 566 F.2d 1225 is revealing and instructive for GISD. Judge Fay states:

. . . The Supreme Court said in *Swann* that the constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole. Id. 402 U.S. at 24, 91 S.Ct. 1280. However, *the Court was very careful to point out that situations justifying one-race schools are rare and must be carefully scrutinized.* (Emphasis added.)

Review of the record in this cause reveals that nothing has been done to attempt to eliminate the racial identifiability and perceived inferiority of Goliad-Washington-Carver schools from 1970 until the recent intense activity designed to implement a magnet school program at Morgan; the exception, of course, being the very significant action in promoting and selling the bond issue in 1975. An objective observer, or reviewing court, might well challenge this Court's conclusion that despite this record of inactivity, the Board has never been, at recent or material times, motivated by segregative intent. This Court's finding with reference to intent, however, is predicated upon a number of factors, discussed in more detail in this Court's order of September 9, 1977.

There is some suggestion in this record that the Board's failure to do everything practicable to eliminate segregation "root and branch" may, at times, have been attributable to a mistaken belief that the Supreme Court of this nation and the Fifth Circuit Court of Appeals might be softening the resolute, determined attitude revealed by the *Green Trilogy: Green v. County School Board*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Raney v. Board of Education*, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); and *Monroe v. Board of Commissioners*, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); and *Alexander v. Holmes County Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). There has even been some hint in the arguments addressed to this Court that the Fifth Circuit en banc might view desegregation cases differently than the panels which have decided such cases. This series of five cases decided over the last six and one-half months should dispel any lingering uncertainty concerning the resolute determination to fulfill the promises of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *Green v. County School Board, supra, Alexander v. Holmes County, supra,* and *Keyes v. School District No. 1*, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

Another case in which a trial judge erroneously concluded that a school district had satisfied its obligation to achieve unitary status was *Davis v. East Baton Rouge Parish School Board*, 570 F.2d 1260 (Fifth Circuit, 1978). East Baton Rouge Parish district contained 110 schools, 20 of which contained solely black children. A panel consisting of Judges Coleman, Tjoflat and Fay held that the trial court's order declaring the district unitary was erroneous, stating:

At a minimum, the district court on remand must evaluate whether any of the essentially one-race schools would be eliminated by the remedial altering of attendance zones or the pairing and clustering of noncontiguous school zones. See *Swann*, 402 U.S. at 27–29 & N. 10, 91 S.Ct. at 1281–82; *Lemon v. Bossier Parish School Board*, 566 F.2d 985 (5th Cir. 1978); *Cisneros v. Corpus Christi Ind. School District*, 467 F.2d 142, 152–54 (5th Cir. 1972) (en banc), *cert. denied*, 413 U.S. 922, 93 S.Ct. 3052, 37 L.Ed.2d 1044 (1973). These are only examples of the permissible tools that may be used to integrate a school system. The district court is di-

476

rected to consider the possible alternatives to the neighborhood school concept and to make findings regarding the feasibility and efficacy of implementing one or a combination of these alternatives.

Two weeks after *Davis v. East Baton Rouge Parish School Board* was decided, a panel consisting of Judges Coleman, Tjoflat, and Fay decided the case of *Tasby v. Estes*, 572 F.2d 1010 (5th Cir. 1978). *Tasby* involved the extensive efforts to desegregate the Dallas Independent School District, an enormous school district both geographically and from the standpoint of student population (138,000 students). The heart of the Dallas plan was the division of the district into six subdistricts. Four of these subdistricts were so zoned as to create a racial mix approximately equal to that of the district as a whole. Two of the subdistricts, however, contained a predominant ethnic group. Seagoville was predominantly Anglo-American and East Oak Cliff, bounded by the Trinity River bottom on one side and by I–35 on the other was approximately 98% black. The district Court, Judge Taylor, concluded that this division of the district was the only practicable division and that there was no practicable manner of creating extensive integration in either the Seagoville or the East Oak Cliff district. This conclusion of the trial court was rejected by a Fifth Circuit panel consisting of Circuit Judges Coleman, Tjoflat and Fay because, the Court of Appeals concluded, the district court had not made adequate inquiry as to whether the more extensive usage of the desegregation tools described in *Swann*, including pairing and busing, would in fact remove the racial identifiability of the Seagoville and East Oak Cliff districts. The key language of the opinion is:

> The DISD acknowledges that the creation of the all black East Oak Cliff subdistrict and the existence of a substantial number of one-race schools militate against the finding of a unitary school system. It contends, however, that this is the only feasible plan in light of natural boundaries and "white flight." The district court was instructed in the

opinion of the prior panel to consider the techniques for desegregation approved by the Supreme Court in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). We cannot properly review any student assignment plan that leaves many schools in a system one race without specific findings by the district court as to the feasibility of these techniques. *Davis v. East Baton Rouge Parish School Board*, 570 F.2d 1260 (5th Cir. 1978). There are no adequate time-and-distance studies in the record in this case. Consequently, we have no means of determining whether the natural boundaries and traffic considerations preclude either the pairing and clustering of schools or the use of transportation to eliminate the large number of one-race schools still existing. See *Mims v. Duval County School Board*, 329 F.Supp. 123, 133–34 (M.D.Fla. 1971).

*Conclusion from Recent Cases*

█ If there ever was a valid basis for debate about the legal obligations of the Board, such doubt has been completely dispelled by the five cases discussed above. The commandment of the law is now obvious. Morgan must operate as an integrated school.

█ The Board may initially attempt to comply with the law by a freedom-of-choice plan, such as the magnet plan adopted. This Court is optimistic that this magnet school plan, if properly implemented, will effectively desegregate Morgan; however, if it fails to do so, all of the desegregation strategies and tools described in detail by Justice Burger in *Swann* must be utilized, including as a possible last resort, pairing and busing. A failure to recognize this reality can lead only to delay, frustration and prolonged litigation with all of the disadvantages inherent in long, expensive, emotionally disturbing litigation.

*Selection of Programs to be Included in Morgan Magnet School*

In its earlier orders, this Court has suggested a number of features for possible

inclusion in the Morgan magnet program—including vanguard programs for particularly gifted children, extended day care programs, Montessori programs—and referred the district to a number of the programs discussed in detail by Judge DeMascio in his thorough opinion at the district court level in *Bradley v. Milliken,* 402 F.Supp. 1096 (E.D.Mich.1975). The Board and its administration have (to this date at least) tentatively rejected most of the Court's suggestions as to details of implementation. This rejection, however, in this Court's view, illustrates a healthy attitude of independence and self-reliance. A plan to integrate Morgan must be the Board's plan and not this Court's plan. This Court, the Board, the Board's attorneys, this Court's Tri-Ethnic committee, and the community as a whole can well reflect and be continuously conscious of Circuit Judge Griffin Bell's language in *Calhoun v. Latimer,* 321 F.2d 302 (5th Cir. 1963) where he said:

> We do wish, however, to point out some fundamentals to be borne in mind in the future handling of this and like matters where an approved plan is in operation. Whether to effect a plan, to speed it up or to otherwise modify it is in the first instance for the school board. This is likewise true as to problems arising in connection with the administration of a plan. *The courts are ill equipped to run the schools.* Litigants must not ignore school officials, and school officials must not abdicate their function to the courts. They, like the courts, are bound by the Constitution as interpreted by the Supreme Court. *Cooper v. Aaron,* supra. With these principles in mind, this record discloses no problem that could not be resolved between appellants and the school officials based on the judgment of the school officials as educators, with the application of wisdom, forebearance and mutual trust to the educational purpose of schools. (Emphasis added.)

It is obvious, however, that if the time-table established by this Court on page 469 of this opinion is not met, the Board and its administration must either abandon the magnet school concept or adopt programs which will cause the Morgan school to become desegregated.

This Court is persuaded that the basic concept selected by the Board is an excellent concept. Morgan school is to be modeled upon the Martin Luther King Experimental school in Evanston, Illinois. That school is one of what has now become several thousand experimental schools based upon the "IGE model" (Individually Guided Education). This concept, which the Board and its administration have selected on their own with no guidance from this Court, does seem particularly well adapted to meet the needs of Morgan and its potential patrons.

The IGE model has much to offer both for children who may have been raised in a culturally deprived environment, as well as exceptionally gifted children who may benefit from the more flexible individually oriented programs possible in a school of the type envisioned. The ultimate attractiveness of the school will, of course, depend upon the dedication, skill and enthusiasm of the faculty and staff of the school. It is also apparent to the Court from the evidence adduced at the hearings on December 1, 1977, January 10, 1978, March 24, 1978, April 21, 1978 and May 5, 1978, that the Board and the administration have at least implicitly committed themselves to the proposition that Morgan, to be successful as a magnet school, must be demonstrably superior in every feature which is susceptible of objective measurement—i. e., student-faculty ratio; educational attainment of the faculty; physical facilities; security afforded; and test scores of the pupils.

Fortunately, this Board and its administration have shown the initiative and have exhibited the drive to prepare a magnet school program based upon the ideas and research of the Board and its administration, not upon the suggestions of the Court. The intelligence and aggressiveness of the Board and its administration, therefore, have created a situation in which this Court may assume its proper role, that of monitoring progress, intervening only if that progress is not satisfactory.

*Back-up Plan*

After careful consideration, the Court has determined that it will not require the Board to prepare a specific back-up plan at this time. A back-up plan is a plan to implement in the event the time schedule set forth on page 469 of this opinion is not met. The forced preparation of a back-up plan before a fair trial of the present plan would imply a belief that the current plan will fail. Negative thinking of this type could in fact cause failure. Insistence upon a back-up plan fully formulated at the present time would be a prediction of failure—and such prediction could in fact be a self-fulfilling prophesy. Considerable work and effort will be necessary to make the present plan work, and the finite energy and time of the Board and its administration can best be directed toward making the present plan work.

For purposes of future guidance, however, it is well to list a varied number of possible alternatives if the present plan does not create an integrated school at Morgan. Several of the possible alternatives which occur to the Court are:

1. Adoption of a student assignment plan for Morgan similar to the one adopted in Evanston. As the Court understands the program in Evanston, no child attends the Martin Luther King school simply because he resides adjacent to the school. On the contrary, admission to the school is by application, and such applications are granted by determining which children would benefit most from the programs at that school, with such admissions structured, however, so as to create a racial mix at the school roughly identical to that in the district as a whole. Obviously, the institution of an assignment plan of this nature could best be implemented after the Morgan school has been in operation for a period of time and has established a deserved reputation as a superb magnet school producing both effective desegregation and quality education. In this connection, see Judge Tjoflat's language in *Davis v. East Baton Rouge Parish School Board, supra,* where he says:

 . . . The district court on remand is directed to consider the plan in light of the dual purposes involved: desegregation must be effected, and quality education must be promoted.

 . . .

2. Desegregation at Morgan might conceivably be achieved by different attendance zones. In this connection, it is well to note that Morgan, unlike the Butler school in *Lemon, supra,* is not located in a geographically isolated area occupied solely by Black-Americans. From this Court's observations, the "neighborhood" surrounding Morgan could be deemed to extend from 45th Street on the west to 21st on the east, and from Broadway on the north to the Gulf of Mexico on the south. This is a diverse area, containing people of every conceivable ethnic and socio-economic group. The area contains some of the most historic and interesting local structures in our state. It contains churches attended by persons of every imaginable ethnic and socio-economic background. Ball High School is attended by all of the public high school students in the district. Ball High is a superb example of a successful, fully-integrated, multi-ethnic high school in which a child of any race can obtain the best education which he has the motivation to receive.

3. A pairing or clustering plan similar to the so-called "Vollert Plan" or the "Blankenship Plan," a pairing plan endorsed at one stage of these proceedings by the plaintiffs.

4. Some other strategy or combination of strategies not presently readily apparent to the Court.

*Issue No. 2—Transfer Program Relating to Siblings*

█ The plan proposed by the Board contemplates that it is desirable to keep

children of one family in the same school. Accordingly, where a transfer student qualifies for some special instructional program, the family will be permitted to place all of its elementary age children in the same elementary school. Amicus opposes this portion of the Board's transfer problem.

Circuit Judge Goldberg has observed in *Lemon, supra,* that:

> . . . We do note that in choosing among plans each of which satisfy the constitutional requirements for desegregation, the courts must strive to keep abrasions and dislocations to a minimum. 566 F.2d 985 at 989.

Consistent with this command, it seems to the Court appropriate that the Board's position in this regard be adopted and accordingly if, under the applicable and stringent transfer rules, a child of one family is allowed to attend a particular school, all of the elementary school children of a particular age in that immediate family may attend that school. In this connection, however, the Board is directed to be prepared to report to the Court during the first portion of the 1978–79 school term the extent to which this program has an impact upon the desegregation of the elementary schools. If it appears that this relaxation in the strict transfer requirement is having an appreciable effect upon desegregation progress in the elementary schools, it may well be abandoned.

*Issues Nos. 5 and 6* (see page 468, *supra*)

From the foregoing it is obvious that no additional hearing to determine whether GISD has achieved unitary status can be held until the Morgan school has been effectively desegregated. As soon as that objective has been achieved, however, it would appear appropriate for the Court to conduct a hearing to determine whether GISD has achieved unitary status.

In this connection, Rule 1 of the Federal Rules of Civil Procedure, reads:

> These rules govern the procedure in the United States District Courts in all suits of a civil nature . . . . They shall be construed to secure the *just, speedy* and *inexpensive* determination of every action. (Emphasis added.)

To the extent possible, it is the desire of this Court to bring this lengthy litigation, now pending for almost 19 years, to a just, speedy and inexpensive termination. To that end, the hearing which will ultimately be held when Morgan has achieved desegregated status must be in sufficient detail to enable the Court to find that GISD has eliminated all vestiges of the past segregated system with reference to its student population, its faculty, its administration, its physical facilities and extra-curricular activities and programs.

The hearing before this Court in September 1977 has enabled the Court to determine that GISD could, as of September 1978, achieve unitary status with reference to all of its schools with the exception of Morgan. The record, however, contains no evidence concerning desegregation of the faculty or administration. While the Court is reasonably certain from facts of which it has judicial notice, that effective desegregation has occurred in connection with all extra-curricular programs, there is no evidence before the Court from which such a determination could be made.

In addition, there is a racial imbalance at Gladnei O. Parker elementary school, and such racial imbalance is likely to continue. The Court has tentatively concluded both from the evidence, and in part from facts of which the Court has judicial notice, that racial imbalance at the Parker school is the result of residential patterns which have developed in recent years and over which the district has had no control. Geography of Galveston Island is peculiar. The western portion of the island has been the only portion of the island in recent years available for residential construction. Most of the construction there has occurred long after restrictive covenants became unenforceable. The ethnic characteristics of residential subdivisions of the western portion of this island are matters over which the school district has had no control. The Court has, therefore, tentatively concluded that the racial identifiability of the Parker

school is not a vestige of the previously existing dual system; however, before this Court could so find in a final order decreeing that GISD has achieved unitary status, additional evidence, real estate experts, educational experts, and experts in the science of demography would probably be necessary. Such inquiry, however, may well be unnecessary because as Morgan loses its racial identifiability, it is highly probable that Gladnei O. Parker will similarly lose its present racial identifiability.

If the magnet school concept proves successful at Morgan, the Board may well wish to consider the institution of magnet programs at Parker particularly designed to be attractive to Black-American students.

*Inquiry Mandated by Dayton Board of Education v. Brinkman*

In *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851, the Supreme Court said:

If such violations are found, the District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect these violations had on the racial distribution of the Dayton school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference, and only if there has been a system-wide impact may there be a system-wide remedy.

The necessity of making this inquiry was confirmed in *School District of Omaha v. United States,* 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039, and *Brennan v. Armstrong,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044.

It is admittedly difficult for this Court or any finder of fact, to determine what degree of segregation would exist at the Morgan school if from 1970 until April of 1977 the GISD Board had employed all or some of the integration tools described in *Swann* vigorously, effectively, and persistently. The parties, in their evidence and argu-

ments have not addressed themselves to this question.

Despite the difficulty of the inquiry, however, there is adequate evidence before the Court to enable the Court to determine this question. The evidence is itemized as follows:

1. GISD has succeeded, without undue turmoil or disruption, in integrating its high schools, its middle schools, and four of its six elementary schools thoroughly. This success indicates to the Court that if more vigorous, effective and persistent efforts had been made with reference to the Washington-Carver-Goliad problem, considerable progress would have been achieved, and there would have been a reasonable expectation that Morgan school would have opened as a completely desegregated school and never have been racially identifiable.

2. While pairing and busing are not remedies of first choice, and while there is some possibility that pairing and busing would not have eliminated racial identifiability at the Washington-Carver-Goliad complex, the probabilities are that early adoption of some plan like the Vollert Plan or the Blankenship Plan, would probably have eliminated the racial identifiability of these schools.

3. Progressive racial identifiability of the Carver-Goliad-Washington schools was attributable in part to the physical deterioration of the facilities of those schools and the fact that the Board had a responsibility to prevent such physical deterioration. This responsibility was difficult, and perhaps almost impossible to meet because of the refusal of voters to approve bond issues in 1971 and 1973; nevertheless, the responsibility existed.

4. The degree of residential racial isolation in Galveston does not approach that found in large metropolitan areas. There is a substantial degree of residential racial mixing, and this Court cannot conclude from the evi-

dence, or from the facts which it judicially knows, that the racial identifiability of the Carver-Goliad-Washington schools was attributable solely to demographic factors.

5. Some of the racial identifiability of the Carver-Goliad-Washington schools was undoubtedly attributable to the failure of the Board to adopt more stringent controls upon its transfer policies. In addition, until the spring of 1978, the Board had never adopted or vigorously pursued a majority-to-minority transfer program with free transportation and active encouragement of students to participate in such a majority-to-minority transfer program.

While the Court freely acknowledges that it is much easier for the Court to write these words than it would have been for the Board to solve the Washington-Goliad-Carver problem, this Court must nevertheless conclude that a large portion of the racial identifiability at the Carver-Washington-Goliad schools which will initially, probably be carried over into the Morgan school, is attributable to the failure of the Board to take effective action with reference to this problem during the period from 1970 until April 1977.

In addition, as this Court reads the authorities cited in this opinion, the burden is upon the Board to prove the degree of desegregation which would have existed in these schools had the Board met its constitutional obligation with reference to these schools during the years in question. This proof has not been made.

*Neighborhood School Policy*

█ It is now clear from *Austin III, Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), that objective, fairminded, good faith adherence to a "neighborhood school" policy is not evidence of segregative intent.

During the hearing from September 6–9, 1977, GISD offered testimony that much of its action over the years has been predicated upon an adherence to the "neighborhood school" policy. The Court accepts the credibility and good faith of this testimony and finds that in fact over the years the majority of the GISD Board has been motivated by a good faith belief in the virtues of the "neighborhood school" policy.

Despite the fact that the Board has been dedicated, in good faith, to the neighborhood school policy, an accurate assessment of the manner in which the elementary schools have been conducted in the last decade demands a recognition of the fact that geography and demography have required the adoption of practices which are not totally consistent with a neighborhood school policy. This necessity is created by the fact that the largest and most dense concentration of children in GISD occurs in an area in which there is no "neighborhood" elementary school and in which it is probably not practical or practicable to construct a neighborhood elementary school. The most dense concentration of elementary school pupils in GISD occurs in a relatively small area bounded by the central Galveston business district on the east, Broadway Boulevard on the south, the Gulf Freeway on the west, and Galveston Wharves and industrial district on the north. This area, for purposes of this opinion, may be referred to as the Oleander Homes-Cedar Terrace-Palm Terrace area. Located within this rather small geographic area are three public housing projects and one privately owned housing project. The children who reside in these housing projects are predominantly Black-American students.

The one eighth grade school in the district is located in this area; however, there is no elementary school located within this area, and the Court finds that it would be impracticable to construct an elementary school in this area.

It could be argued that the Morgan school is in effect the "neighborhood school" for this area, but this argument appears to the Court unpersuasive. First, the Morgan

school area is considerably different from the area bounded by Broadway, Galveston central business district, the wharves/industrial district and the Gulf Freeway. The Morgan school is located within an area predominantly occupied by one-family dwellings. Elementary age children who reside in the Oleander Homes-Palm Terrace-Cedar Terrace projects can physically walk to Morgan school, but in doing so, it is necessary that they cross Broadway Boulevard, a formidable traffic barrier, and small children can safely cross only with the assistance of adult traffic monitors. It is not safe for a small child to walk across Broadway Boulevard without substantial closely supervised adult assistance.

The physical facts set forth in this section of this opinion have made it necessary for GISD to transport many of the children residing in Oleander Homes, Palm Terrace and Cedar Terrace to Burnet, Alamo, Rosenberg, and Island elementary schools. Because of the concentrated nature of the student population, it is possible for the buses to pick up the children who live in Oleander Homes, Palm Terrace and Cedar Terrace almost at their door steps and return them similarly almost to their door steps. Children from Oleander Homes, Palm Terrace and Cedar Terrace who are afforded transportation are saved from the real physical danger of walking across Broadway Boulevard.

The bus rides in question are not extensive, approximate 15 to 20 minutes one way. Bus schedules are also predicated upon the fact that a substantial number of the children in the Oleander Homes-Cedar Terrace-Palm Terrace area are eligible for free breakfasts under a federally funded program; the existence and timing of the transportation enables these children to take advantage of their entitlements under this program.

 One could infer from a number of the exhibits relating to the so-called "Vollert Plan" and the "Blankenship Plan," both plans for pairing and busing, that at least some of the pressure for the adoption of a "Vollert Plan" or a "Blakenship Plan"

arises from a feeling on the part of some that greater equity would result from two-way transportation rather than one-way transportation. While this point of view may have some arguable merit, the Court is unpersuaded for the following reasons:

1. The transportation of children from the Oleander Homes-Palm Terrace-Cedar Terrace area is a beneficent program to provide real benefits to the children and their parents. The child who is afforded transportation virtually from his front door to his school and back, afforded in many instances a free breakfast, and saved the risk of walking across the island's most heavily traveled thoroughfare, cannot really feel legitimately deprived or discriminated against by GISD. A parent who is given the peace of mind of knowing that his child has a safe way to school and is saved the financial and psychological burden of affording transportation to his elementary school age children cannot legitimately feel that he is discriminated against.

2. There is no proof in this record that more Black-American children ride more miles on school buses than Anglo-American children. Within the GISD, the children having the longest bus rides are predominantly Anglo-American children who are transported to the city from the far west end of the island, or from the Bolivar Peninsula.

3. The transportation plans of GISD would probably not be materially different even if it be hypothesized that all of the children in the Oleander Homes, Cedar Terrace and Palm Terrace were Anglo-American children. No matter what the race of the children in these housing projects, transportation would probably be necessary to fit this large concentration of students into the physical facilities for elementary students.

*Washington v. Davis, supra,* and *Village of Arlington Heights v. Met-*

*ropolitan Housing Dev. Corp., supra,* teach that an official act is not unconstitutional merely because it has a racially disproportionate impact. An official act with a racially disproportionate impact becomes unconstitutional only if the act is taken because of a racially discriminatory purpose. This Court finds that the transportation of children from Oleander Homes, Cedar Terrace and Palm Terrace has not been undertaken with a discriminatory purpose, but in fact has been undertaken for benign and beneficent reasons and the fact that this program results in the transportation of a greater number of black children than Anglo-American children is the result of residential patterns over which this Board has no control.

ORDER

For the reasons set out hereinabove, it is

ORDERED, ADJUDGED and DECREED that Morgan school must operate as an integrated school, that this integration program will proceed at the scheduled rate set forth herein, and that after such integration has occurred, this Court will conduct a hopefully final hearing for the purpose of determining if a final judgment may be, at long last, entered in this protracted litigation.

APPENDIX

EXHIBIT A

BE IT REMEMBERED that on the 9th day of September, 1977, beginning at 8:30 a. m., the above styled and numbered cause came on for hearing before the Honorable Finis E. Cowan, Judge of said court, and the following proceedings were had.

PROCEEDINGS

THE COURT: Gentlemen, the Court is prepared to announce its tentative findings and rulings in connection with the issues before the Court and I will do so at this time.

The present ruling and judgment of this Court is as follows:

1. The previously entered injunction prohibiting the use of the new facilities being constructed at Carver, Burnet and Island is dissolved. The Galveston Independent School District, which I will hereinafter refer to as GISD, is granted permission to proceed with the continued construction of the facilities, the contemplated demolition of older facilities and granted permission to use the facilities being constructed upon their completion for the education of the children of this district.

2. The Court expressly declines to find at this time that GISD has achieved unitary status. The Court finds, however, that there remains only one vestige of the dual system. The Court also finds that the system wide violations, the historic violations existing up to 1961, have been corrected except for Carver. The one remaining vestige of the dual system in the Court's opinion is the Carver School.

This Court finds that the law as enunciated in the Green Triology in 1968, requires every School Board to take all practicable steps to eliminate every vestige of a previously existing de jure dual system root and branch and to counteract the effects of past discrimination. GISD has made commendable, praise worthy progress in achieving this goal, however, whereas here there still exists a racially identifiable school and the law requires this Court to place upon the school district the heavy burden of proving by persuasive evidence that this racial identifiability is not the result of the previously existing de jure dual system.

GISD has not, in this hearing, met this burden with reference to this Carver School. It has, in this Court's view, met its burden with reference to the Island school.

The Court makes the following findings of fact with reference to the intent of the GISD and its present Board of Trustees:

A. In connection with the construction and expansion program currently underway at the Island, Burnet and Carver Schools, the GISD Board of Trustees has been moved at all times by the most commenda-

ble motivations. The Board and its members have at all times had this intention and the firm determination to comply with the requirements of the law.

In this connection, under the unique circumstances here, the construction program at the Carver School has been and was intended to be an affirmative and constructive step towards eliminating the perceived inferiority of the Carver School and this construction is a first and essential step in removing all actual or perceived inferiority of this school.

B. The current members of the Board of Trustees of GISD, each of whom has testified in person and in detail at this trial and has been subject to searching scrutiny in cross examination by able Counsel for Plaintiff and the Department of Justice, are all dedicated to the elimination of all vestiges of the dual system and are committed to the implementation in the most practicable form of the principles enumerated in the Brown versus Board of Education and in all of their conduct have been consistent with that manifest dedication.

The existence of the one vestige left of the dual system; that is, the Carver School in its present state and in the state which it will probably exist when the new facility is opened, is attributable, in the Court's view, to three factors:

First, the basic fact that GISD, like all organizations, simply cannot solve every problem facing it in a matter of weeks, months or perhaps even years, just as this Court cannot try every case on its docket within the next six months and the Department of Justice cannot solve all of the problems facing it within the next six months or the next six years.

Second, the fact that in the area of school desegregation law, the legal rulings have evolved gradually. For this reason, there has been no way for the Trustees of the GISD, no matter how competent, intelligent and dedicated, its legal advisers to know with certainty what action would be required to enable them to comply with the requirements of the law. The Trustees, under the circumstances, have patiently done the best they could to grapple with difficult problems which they did not create. The Court specifically finds that the Trustees of the School Board have in complete good faith done their very best to grapple with these problems.

The third factor is that the present majority of the School Board has in complete good faith been committed to the neighborhood school concept for the elementary grades. Such commitment in neighborhood schools and the neighborhood school concept has been a good faith commitment and not in the slightest degree based upon an intent or desire to perpetuate any vestige of the dual system existing by law before 1961.

This dedication to the neighborhood school concept is no evidence whatsoever of segregative intent.

This Court also holds and finds as a finding of fact that the unique geography of this island has created a situation in which the sites selected for the new construction here in issue were the only practicable sites and for this reason, the Trustees have met their obligations under law with reference to site selection.

The plan submitted by GISD, Plaintiff's Exhibit No. 4, is accepted and approved as far as it goes, but the Court finds this plan seriously inadequate in certain respects set forth in more detail below.

In analyzing this plan and attempting to draft an opinion which all members of the community can understand, this Court must point out that the Court must ask itself two questions and arrive at two answers in this case.

The first question is: this Court, by virtue of law as enunciated by the Supreme Court of the United States and the 5th Circuit Court of Appeals, legally obligated to order the pairing of Carver and Island schools and the subsequent busing that would be entitled by such pairing.

This Court holds and concludes as a matter of law that this Court is not legally obligated to adopt this course because the nature of the Constitutional violations

found does not justify such an extreme remedy. The decision of the Board here to reject pairing was a carefully and democratically considered decision. This Court holds it would be both unwise and an illegal usurpation of power on the facts of the record as it currently exists to set aside that determination.

The second question is: Does this Court even have the legal authority to order pairing were it inclined to do so and this Court's answer to that is no. The reason again relates to the nature of the Constitutional violations found.

Now, this School Board should realize, and this Court admonishes it, that the power of this School Board in this connection is greater on the basis of the record here than is the power of this Court. This is true because the Board does have the authority to adopt pairing as a legitimate desegregation and educational tool if it elects to do so, but on the record here and the law as this Court understands it, that decision for the present at least is a decision that rests with this Board.

Now, the Court wishes to make it very clear that this Court expresses no opinion whatsoever on whether pairing and busing would be good or bad. This, on the facts of this case, is a determination to be made by the Board of Trustees of GISD. Alternatively, this Court holds that if it did have the legal authority to order pairing and busing which would be entailed by such busing, the Court declines to order the pairing and busing at this time because it is the conviction of the Court that there are other remedies which are more appropriate and less extreme.

The remedies which the Court suggests that the Board seriously consider in this question and in this matter are spelled out in detail in Judge DeMascio's District Court opinion in the case of Milligan versus Bradley and the Supreme Court of the United States opinion approving the remedies adopted by that District Court.

The Court approves Plaintiff's Exhibit No. 4, the plan as far as it goes, but orders the Board if it determines to continue to reject the concept of pairing island and Carver to take the following action immediately:

The Board is instructed to institute studies and actions which have as their objective the elimination of Carver as a vestige of the previously existing dual system. This plan must be the Board's plan, not this Court's plan, and the Court cannot emphasize this too much. I am sure that the Board does not wish and will not abdicate FEC its responsibility to this Court. In this connection, however, in drafting this plan, this Court makes to you the following suggestions or makes to the Board the following suggestions:

First, the majority to minority transfer system, which is previously described at the bottom of Plaintiff's Exhibit No. 4, must be improved. Free transportation must be provided for students who desire to take advantage of such a transfer policy. Systematic, effective encouragement must be given to groups of students to take advantage of this policy. The Board is requested and urged to determine how this desegregation tool has been used effectively in other communities and the Court suggests that the Board make inquiries as to measures in which this desegregation tool had been successfully implemented in the schools of New Haven, Connecticut.

Second, the Board must advise a more effective transfer policy with more stringent controls. In this connection, the Court suggests that the Board give serious consideration to those portions of the Plaintiff's plan, Plaintiff's Exhibit 8, which deal with that point.

Thirdly, the Court respectfully suggests to the Board of Trustees that the Board seriously consider special education programs such as remedial reading, bilingual education, special language instruction, programs for particularly gifted children which can be conducted at Carver so that Carver may actually become and may be perceived in the community as an island of educational excellence so as to attract students of all races.

This Court respectfully suggests to the Board that the Board include in its plan a method of insuring that strenuous efforts be made to be certain that the faculty at Carver is not just equal to, but is in fact possibly superior to that in other schools so that the past effects of discrimination may in fact be countered and rooted out.

This Court respectfully recommends and requests the Board in drafting its plan to devise a method so as to be certain that extracurricular programs at Carver are at least equal, if not superior, to those of other elementary schools.

The Board is encouraged to consult with the Amicus Curiae and with the Department of Health, Education and Welfare representative, Miss Jacobo, who has attended this trial for purposes of obtaining such guidance and ideas as those persons may be able to give in drafting this supplemental plan which this Court is requiring.

Now, it is the belief of this Court that GISD can draft and complete a plan which will result in the removal of Carver as the last vestige of the dual system. In this connection, however, this Court cannot foresee the future any better than can anyone else in this room and the Court must place the Board on notice of several things:

First, if the efforts suggested do not remove Carver as the last vestige of a dual system, this Court or some superior court may ultimately be forced to hold that pairing and the associated busing, in fact, are Constitutionally required. This Court must say to you that there are many capable, dedicated, highly informed lawyers and judges with considerably more expertise and experience in this field than this Court, who would probably hold on the basis of the facts here that this Court is legally obligated to compel this pairing. This Court does not hold this view, but acknowledges the possibility that it may be wrong.

This Court specifically here declines to accept or adopt Plaintiff's Exhibit 8 and the plan set forth therein, but urges respectfully the Board of Trustees of the GISD to consult with those persons in the community who have authored and sponsored Plaintiff's Exhibit No. 8 and to take advantage of the study, thinking and dedication and obvious interest of that group which has done considerable work in an effort to promote their views of what excellent and fair education in this community requires.

Now, this Court has declined at this time to accept the position of GISD that it has achieved unitary status. It seems only fair to this Court that this Court give you the full benefit of its thinking as to what this Board must do to ultimately achieve the goal of arriving at unitary status so that this case may be closed and this Court need no longer intrude itself into the educational affairs of this community.

As the Court sees this situation, the Board of Trustees currently has three basic options:

First, it can and this Court does not recommend that it do so, but merely points out that it can reverse its previous close decision and adopt the pairing plan set forth in the so called Vollert report. In this Court's opinion, this in all likelihood would create a unitary system, but even this is not certain. If pairing were adopted and Carver continued in the community perception to be an inferior school or a predominantly black school, which could occur, it could still be persuasively argued in this or some other court, that Carver still remains as a vestige of the dual system.

The second option this Board has is to prepare a supplemental plan of the type respectfully suggested by this Court's current opinion.

The third option is there may be some combination of these two approaches which does not currently occur to the Court.

Now, those superior courts who direct and oversee the efforts of this Court and who correct errors which I make, have constantly emphasized that the School Board and this Court to the extent that it must, should strive for that plan which will create the most permanent and long-lasting solution to this problem and I would respectfully urge the Board to do that.

Now, as to the duration of this order which I am dictating in the record today. The duration of this order is fairly short. It is the Court's intention to prepare a written opinion after the affidavit which has been suggested has been filed and after this Court has had an opportunity to consider any briefs which the parties may wish to submit after this hearing.

The method that I have taken to announce my current ruling is admittedly not ideal, but has been adopted because of this Court's conviction that all of the parties to this case are entitled to know what this case is going to do because all parties need to plan.

The Court gives leave right now for any party to file such motions as they feel are necessary seeking a modification of the order which is being entered today and the Court will consider such motions in what I hope will be an open minded and flexible manner.

Now, if the Board elects to adhere to its neighborhood school policy adopted by the majority and elects to prepare a supplemental plan of the type suggested herein, the Court will expect such a plan to be on file here within one hundred and twenty days from today.

The Court announces its intentions to hold a hearing in approximately sixty days here in Galveston at a precise time to be announced later at which the Court will request the Board to give it a report upon its progress in preparing its supplemental plan.

After the supplemental plan is prepared and filed, the Court will schedule a hearing at which all parties may appear, present evidence and move for such additional or different relief as may seem appropriate.

One of the problems in a case of this nature is to provide some means by which parties may communicate with the Court. The Court is very firmly dedicated to the avoidance of any form of ex parte communication, but also believes it must, in a case of this nature, be accessible and therefore, the method which will be adopted there will

be that if any party, at any time, wishes to move for additional supplementary or different relief and motions will be filed and we will hear it at night, on the weekends, at any other time as rapidly as possible so that all parties may be advised.

Now, this Court feels that it has an obligation to make findings of fact so that if this Court is wrong, it can be readily reversed on appeal. So in fulfillment of what the Court perceives to be that duty, this Court makes a finding of fact that the Vollert plan is a practicable plan. This does not mean that this Court is finding that the Vollert plan is a good plan, a bad plan or the best plan. The Court makes this finding only because it may be of some assistance to an appellate court in drafting affirmative and appropriate relief if an appellate court determines that this Court has erred. . . .

## EXHIBIT B

### ORDER OF MARCH 1, 1978

#### I.

*Intervention and Class Representation*

The Court has before it the motion of Weldon H. Berry, the attorney for plaintiffs, to certify additional plaintiffs. The Court will treat this as a motion for leave to intervene; and such motion, thus construed, is GRANTED, and leave is granted to Jessie Vaughn, through her parent and next friend, Maggie Jones; to James Pomier, through his parent and next friend, Lala J. Cross; to Yvonne Sylvester and Ronald Sylvester, through their parent and next friend, Viola Sylvester; to Ramona Allen and Rogers Allen, through their parent and next friend, Ollie Allen; to James D. Haynes, through his parent and next friend, Idella R. Craney; and to Ellsworth Wilcox, Jr., through his parent and next friend, Patricia Ann Robinson Wilcox to intervene; and such parties shall thereafter be deemed parties to this cause and identified as "Intervenors."

This "Motion to Certify Additional Plaintiffs," treated by the court as a motion to

intervene is GRANTED, with the understanding that the next friends of the minor plaintiffs will do their best to attend future hearings in connection with this case, attend meetings of the Tri-Ethnic committee, once designated, and to assist the current class representatives in their prosecution of this cause.

In view of the fact that the current class representatives no longer have children in elementary schools, and since the entire present focus of this litigation is on the elementary schools, the Court still feels that it is questionable in law, whether the current plaintiffs are proper class representatives in the light of the requirements enunciated by the Supreme Court of the United States under Paragraph I in *Pasadena City Board v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). In that case the Supreme Court dealt with a situation in which all of the original student plaintiffs had graduated from the Pasadena School system. The Supreme Court held that in that case, but for the intervention of the United States, the case would have been moot and that the case or controversy requirement of Article III of the Constitution of the United States would not have been satisfied. While the case at bar is not exactly analogous to *Pasadena City School Board v. Spangler*, Mr. Smiley's children are no longer elementary school children. Apparently only the elementary schools are currently involved in this controversy, it being conceded that a unitary system has been achieved except in the elementary school system. The safer course, therefore, in order to preserve the rights of all parties will be to add as a class representative one of the next friends of the current intervenors. Plaintiffs and their counsel are directed to confer with the intervenors and determine which of the next friends for the intervenors is the most appropriate class representative, and at the hearing of March 21, 1977, the court will hear evidence concerning addition of one of the next friends as an additional class representative.

The court infers no lack of respect for the current class representatives, but seeks to follow the law enunciated in *Pasadena City Board v. Spangler, supra*. In this connection, also, the court is perfectly willing to allow Mr. Smiley and Mr. Murphy to continue as class representatives, but feels that the law as enunciated in *Pasadena City Board v. Spangler, supra*, makes it prudent, in the protection of the interests of all parties, to add an additional class representative, in addition to Mr. Smiley and Mr. Murphy.

The Court has before it a document entitled "Plaintiffs' Response to Defendants' Second Progress Report" submitted on January 10, 1978. The Court does not know whether the thoughts and ideas contained in the "Plaintiffs' Response to Defendants' Second Progress Report" express the thoughts and suggestions of intervenors, but if it does not, counsel for plaintiffs and intervenors is requested to file with the Court, as expeditiously as possible, any additional documents stating the ideas, thoughts and criticisms of intervenors concerning the documents filed with this Court on January 10, 1978, and entitled "Second Progress Report on Supplemental Plan to be Submitted Pursuant to the Court's Order of September 9, 1977"; "Report of Administration Concerning Plans for the L. A. Morgan Elementary School"; and "Defendants' Memorandum to Court re Establishment of Tri-Ethnic Committee." In this connection, the Court currently has under consideration the documents filed on January 10, 1978, along with the suggestions contained in a letter dated January 20, 1978 from Ms. Paulina Jacobo, and Mr. James C. McClure of the Department of Health, Education and Welfare Regional Office in Dallas, Texas, as well as the "Plaintiffs' Response to the Defendants' Second Progress Report Submitted on January 10, 1978."

## II.

### *Tri-Ethnic Committee*

With reference to the defendants' documentation filed on January 10, 1978, the Court enters the following order to wit:

With reference to the "Defendants' Motion to the Court re Establishment of Tri-

Ethnic Committee," the defendants' position as asserted in this document is DENIED. The Court will appoint a Tri-Ethnic Committee, consisting of four Anglo-Americans, four Mexican-Americans and four Black-Americans. Nine members of this committee will be appointed by March 21, 1978. The remaining three members will be appointed at a later date. The function of this committee will be to monitor the implementation of this Court's orders, to make suggestions concerning the efforts of GISD to eliminate all vestiges of the dual system, and to assist this Court and the school board in any appropriate way in the formulation and implementation of plans to eliminate all vestiges of the dual system by making the L. A. Morgan a "superior magnet" school, which will attract students of all races and which will be accurately perceived by the community as a superb school with no racial identifiability of any type and character whatsoever.

GISD is legally obligated to remove every vestige of the prior dual system. One vestige of such dual system is the present racial identifiability of the Carver school. A realistic goal is a racial mix in the new Morgan school in which the Negro-American population of the school is less than 50%, and the remaining 50% is approximately evenly balanced between Mexican-American and Anglo-American students. In this connection, however, it is legally uncertain that, on the basis of the record as currently developed, this Court has authority to require on a permanent basis any particular degree of racial balance.

It is highly desirable and legally necessary that GISD achieve unitary status as rapidly as possible. Once unitary status is achieved and a proper, supportable decree entered declaring that GISD has achieved a unitary status and that decree has become final in accordance with the procedures prescribed by the Fifth Circuit Court of Appeals, this Court's jurisdiction of this case will be ended and the administration of GISD's business will be totally in the hands of the elected representatives of GISD. The primary function of the Tri-Ethnic Committee is to assist this Court and the board of GISD in achieving true unitary status as rapidly as possible so that compliance with the law will be achieved and so that GISD can proceed to administer its affairs totally through its elected representatives without interference by this Court.

### III.

*Majority-to-Minority Transfer*

With reference to "Addendum A," which is a proposed policy respecting majority/minority transfers, such addendum and such policy is approved, conditioned, however, on the following requirements:

A. Defendants, through their duly designated representative or representatives, will within 45 days, conduct extensive studies and formulate a precise and definite plan whereby the majority/minority transfer program will be publicized, and students and parents of all three ethnic groups will be actively encouraged to participate in the majority-to-minority transfer program. In this connection, GISD's representative or representative must confer with and become thoroughly knowledgeable concerning methods which have been employed in other school districts, specifically the Houston Independent School District (hereinafter "HISD") and the Evansville, Indiana, School District, and other school districts to publicize the majority-to-minority transfer program and encourage voluntary participation in that program. In this connection, the court will conduct on March 21, 1978 a hearing at which the representatives of GISD who have both immediate and ultimate responsibility for the majority-to-minority transfer program will be required to report orally in open court concerning exactly what steps have been taken to publicize the majority/minority transfer program, and to encourage students and parents of all races to participate in this program. The representative who

testifies on this occasion must be prepared to give testimony concerning those persons with whom he has conferred, the information received from such persons and the exact steps which GISD is taking and will take, concerning active encouragement of participation in the majority-to-minority transfer program. The provision contained in Paragraphs C and E of Addendum A shall in no event be used to decrease the number of students engaging in the majority-to-minority transfer program, but defendants will, if at all physically possible to do so, create space for majority-to-minority transferees, even to the extent of obtaining and furnishing temporary buildings, if necessary, or rearranging attendance lines to accommodate majority/minority transferees if such should become necessary.

B. The Board must accept as a goal a situation in which the number of majority-to-minority transferees increases steadily during the period of time that this school district remains subject to court supervision.

C. The defendants shall give serious study to the question of whether or not Paragraph E of Addendum A is necessary or desirable. In this connection, it is the Court's information that the majority-to-minority transfer program in other districts does not have this provision; that majority/minority transfers are encouraged at every stage of the year and means are undertaken to assure that a student wishing to take advantage of the majority/minority transfer program may do so at any time during the school year. In this connection, the defendants are instructed to confer with other school districts having majority-to-minority transfers concerning their experience in this connection and to consider seriously the elimination of Paragraph E of Addendum A. At the hearing scheduled for March 21, 1977, the individu-

al with the defendant actually making these inquiries should be prepared to appear in open court and testify concerning exact and precise inquiries made, persons conferred with in this connection, information received and be in a position to explain to the Court and all parties why the provision contained in Paragraph E of the proposed majority-to-minority program cannot be abandoned.

D. Plaintiffs, intervenors, and amicus acting on behalf of the Department of Health, Education and Welfare, are invited to submit, as soon as possible, but in no event later than March 21, specific suggestions for changes, modifications, additions or deletions to "Addendum A" entitled "Proposed Policy Respecting Majority/Minority Transfers."

IV.

*Student Attendance Areas and Transfers*

The document entitled "Proposed Amendments to the Policy and Regulations of GISD as Respects Student Attendance Areas and Transfers for Cause," identified as "Addendum B," to the "Second Progress Report on Supplemental Plan to be Submitted Pursuant to the Court's Order of September 9, 1977" is APPROVED; however, the following conditions shall be attached to such approval:

A. Any medical opinion from a doctor submitted pursuant to Paragraph 1, shall be sworn to by the doctor before a duly authorized notary public. In addition, the GISD representative making the basic decision to authorize the transfer shall interview the doctor by telephone or personally, and make an independent judgment that the request for transfer is based upon objective medical evidence and in no way motivated by a desire to avoid racial mixing. The number of transfers for medical reasons shall be kept to an absolute minimum, and the Court shall, in periodic reports

which will be furnished to the Court, be given precise and definite information concerning the number of such medical transfers.

B. The second page of "Addendum B" states: ". . . Procedures for Transfer: A student is expected to attend the school in the school zone where he lives . . ." This language is approved, conditioned on the addition of the following language: "A student is expected to attend the school in the school zone where he lives, except that it is the policy of GISD to encourage actively and vigorously all eligible students and their parents to participate in GISD's majority-to-minority transfer program and GISD's magnet-school program in connection with the L. A. Morgan school."

C. Plaintiffs, intervenors and amicus acting for the Department of Health, Education and Welfare, are granted leave and are invited to file precise, exact suggestions for changes and modifications in the "Proposed Amendments to the Policy and Regulations of GISD as Respects Students Attendance Areas and Transfers for Cause," as expeditiously as possible, and in any event, by March 21, 1978.

### V.

The Court also has under consideration, a report of GISD dated January 9, 1978, entitled "Report of Administration Concerning Plans for the L. A. Morgan Elementary School" identified as "Addendum C" to "Second Progress Report on Supplemental Plan to be Submitted Pursuant to the Court's Order of September 9, 1977," and filed herein on January 10, 1978. The background with reference to this report is as follows.

This Court on September 9, 1977 after an extensive hearing at which all parties were given an opportunity to introduce all evidence which they wished and after all parties were given an extensive opportunity to cross-examine each witness who appeared, entered by dictating into the record in open court, an order which has been transcribed by the court reporter and filed among the papers of the cause as document # 86, dated September 27, 1977. This document is identified as the Court's Order of September 9, 1977, and this order in essence gave GISD three options:

A. Adopt the so-called "Vollert Plan," involving the pairing of Island and Morgan schools, and the considerable busing which would be associated with such a plan;

B. Convert the L. A. Morgan school into a magnet school, which will attract students of all races and remove any possible vestige of the dual system;

C. Some combination of the first two options not readily apparent to the Court.

In accordance with a schedule established by the Court, GISD within 60 days reported back to the Court, that the Board, in effect, had adopted Option B above, was determined to convert Morgan school into a magnet school which would attract students of all races, and was engaged in plans to accomplish that purpose. Within the 120-day period established by the Court's order of September 9, 1977, GISD filed with the Court the plan which it adopted as "Addendum C" and entitled "Report of Administration Concerning Plans for the L. A. Morgan Elementary School."

This Court for the reasons set forth in the order of September 9, 1977, and for additional reasons which will be explained in more detail in a written opinion which this court has in preparation, is tentatively of the view that this Court, in view of the nature of the constitutional violation, has no legal authority to compel pairing of the Island and Morgan schools *at this time.* In this connection, however, the Court does not find that the record presently before the Court is sufficiently detailed to allow the Court to make an irrevocable finding of fact or conclusion of law incorporating the statement in the prior sentence.

In addition, this Court is persuaded that GISD has selected the most reasonable of

the options and that Option B holds the greatest promise for producing meaningful and permanent integration at the Morgan school and throughout the elementary school system of GISD. Accordingly, there is no reason for GISD to delay in any way in connection with commencement of the basic tasks necessary to make the L. A. Morgan school into the most excellent magnet school in this region. It must be firmly understood, however, that GISD cannot comply with the requirements of the law by simply making Morgan a superior or innovative elementary school; on the contrary, GISD must as soon as possible by all practicable means, remove any racial identifiability of the Morgan school. Neither the faculty nor student body should be predominantly of one race, and if, upon opening, the Morgan student body is predominantly one race, then every practicable step to remove such racial identifiability must be taken as quickly as possible. This Court is persuaded and is optimistic that Morgan's possible initial racial identifiability (if such identifiability does in fact ultimately exist) can be removed without non-contiguous pairing and the forced transportation inherent in pairing.

GISD has suggested that it should be given a definite period of time in which to establish a program at Morgan and evaluate its effectiveness. This appears to the Court to be a reasonable request, but in fixing the duration of such period of establishment and evaluation, the Court wishes the advice of all parties and of the Tri-Ethnic Committee.

### VI.

This Court incorporates by reference herein the contents of the Court's letter of January 27, 1978, a copy of which is attached hereto as an exhibit. GISD is ordered to perform the actions set forth on page 3, et seq., as fully and completely as possible before March 21, 1977.

### VII.

Developments since September 9, 1977, have persuaded this Court that it is necessary that a verbatim transcript be prepared of the hearing that terminated on September 9, 1977, and all subsequent hearings. Cost of the original of such transcript is assessed against GISD.

ENTERED this the 1 day of March, 1977.

### EXHIBIT C

January 27, 1978

Mr. Weldon H. Berry
711 Main Street, Suite 620
Houston, Tx 77002

Mr. Bryan F. Williams, Jr.
Royston, Rayzor, Vickery & Williams
205 Cotton Exchange Bldg.
Galveston, Tx 77550

Mr. Edward Schwab, III
Lambdin, Schwab & Coughlin
601 Moody National Bank Bldg.
Galveston, Tx 77550

Mr. Jeremiah Glassman
Department of Justice
Civil Rights Division
Washington, D. C. 20530

Mr. James Gough
Assistant U. S. Attorney
P. O. Box 61129
Houston, Tx 77208

Re: Tyrnn Smiley, et al v.
Frank Vollert, et al,
Civil Action No. 2643

Dear Counsel:

The purpose of this letter is to respond as quickly as possible to the material filed by GISD on January 10, 1978, and the responses thereto filed by plaintiffs on January 24 and to Ms. Jacobo's letter of January 20, 1978. I have received, but not had an opportunity to study in detail, the material filed by amicus on January 26, 1978.

The most ideal way to respond to this material would be in a detailed order. Such an order is in preparation; however, there will be some delay in the preparation of a final order responding to this material because I wish to re-review all of the current applicable authorities and the exhibits from the September 9 hearing before entering a

final order. On the other hand, it is imperative that the actual hard work of making the Morgan school the best magnet school in this region commence *immediately;* and the purpose of this letter is to encourage GISD to begin this work immediately and proceed with the work as expeditiously as practicable.

There is no reason why the actual work of making the Morgan school the best magnet school in this region should not commence immediately. In fact, it should have begun long ago. The entire thrust of the hearing which ended on September 9, 1977 was to determine the basic direction which the district would take in connection with the new schools. The basic decision which was made on September 9, and confirmed by GISD at its initial report 60 days later, was that all vestiges of the dual system would be eliminated by strengthening the majority-to-minority transfer program, tightening controls upon medical and hardship transfers, and most important, making the Morgan school into the best magnet school in this region.

It is imperative that not a day be wasted because there is at least a possibility that if the district works hard enough and effectively enough between now and September of this year, the new Morgan school, from its very inception, may be so excellent and so attractive to children and parents of all races, and such a successful magnet, that it may never (not even in its initial year) be a vestige of the old dual system.

The court infers from statements in court and from the documentation filed on January 10, that GISD has hesitated to implement the actual work of making Morgan a magnet school because it is fearful that this court is going to change the basic ruling from the bench on September 9. That fear should be dispelled. Insofar as this court is concerned, the basic decision has been made, and from this point forward, the work is implementing the decision. The court's basic decision, which has now as I understand it been accepted by the School Board, is, of course, subject to modification or reversal on appeal; but insofar as this court is concerned, it is irrevocable and final, and its basic thrust and philosophy will be implemented unless some higher court directs otherwise.

The thoughts in the previous paragraph are subject to one important exception. This court is now convinced that the delay in planning and doing the actual work of making Morgan an excellent magnet school is itself a constitutional violation. This is true because the law as enunciated in the *Green Trilogy* and *Alexander v. Holmes County* places upon the Board primarily and this court secondarily an *affirmative duty* to take all practicable steps to eliminate all vestiges of the dual system *now.* See footnote 10 in *Austin III.*

This court's final order will seek to meet and implement many of the suggestions contained in Plaintiffs' Response to Defendants' Second Progress Report Submitted on January 10, 1978, and in Ms. Jacobo's letter of January 20, 1978; but it appears to the court imperative that GISD immediately take the following affirmative steps, at least:

1. GISD through its appropriate representatives who are involved in the objective of making the Morgan school the best magnet school in this region must immediately seek detailed information from other school districts concerning precise, exact programs which have succeeded in the past in attracting large numbers of white students and Mexican-American students into inter-city schools. In this connection, this court knows that Montessori programs, Vanguard programs, language programs, and extended day programs have been extremely successful in attracting whites and Mexican-Americans in the Houston Independent School District. While this court recognizes that Galveston is different from Houston, we are still part of the same region. It seems to this court imperative that the appropriate representatives of GISD take advantage of the extensive experience of HISD and other

districts by making precise and exact determinations as to what programs have been successful in HISD in attracting white and Mexican-American students into central city schools and implementing such programs at the Morgan school.

This court fully recognizes that the success of the Morgan school could be imperiled if too many programs are instituted; however, the court must candidly state that there is considerable merit in Ms. Jacobo's and Mr. McClure's position stated in their letter of January 20, that the plan as currently submitted has not given sufficient consideration and thought toward devising programs which will in fact attract white and Mexican-American students to the Morgan school.

2. GISD must *immediately* commence aggressive, intensive effective efforts to recruit Mexican-American and white students to attend the Morgan school. "Recruitment" in this context is not a bad word; it is an *essential* activity. The court's order which will be entered as soon as possible will insist upon active, aggressive recruitment of white and Mexican-American students, and will insist upon detailed explanations as to exactly how this is to occur, and who is to do it. Again, GISD should seek specific advice from other districts who have succeeded in setting up successful magnet programs concerning exactly what recruitment techniques have been effective and should be prepared to report to the court on exactly what has been done in this connection.

3. The court will require specific projections and goals. In this connection, the court has only fragmentary information upon the material contained in this paragraph, but the court has some partial information that federal moneys are available to assist magnet school programs where the magnet school in question achieves a racial mix such that a school is less than 50% black or Mexican-American. It seems to me that this is a realistic goal for Morgan and that there is some possibility of achieving this goal even as early as September of 1978, and at the very latest by September of 1980.

This court has made a promise to Mr. Berry and his clients, in open court, that this program would not take forever. In addition, and perhaps more important, we must all be mindful that the Supreme Court of the United States told each of us in 1968, a decade ago, that every court supervising a school district, has an affirmative duty to take all practicable steps now (i. e., immediately) to eliminate all vestiges of the dual system. The Fifth Circuit in *Austin III* (decided on November 21, 1977) has stated again clearly that failure of a district to take all practicable steps to eliminate the vestiges of the dual system *now* is strong, perhaps compelling evidence of segregative intent.

4. GISD must immediately make certain that this effort is adequately staffed. If it is necessary to hire additional personnel to staff this effort, such personnel should be hired as soon as practicable.

Mr. Vollert and other members of the school staff obviously have multiple other problems with which they must grapple, but some highly effective and responsible official of GISD should, in this court's view, be assigned to work absolutely full time, with total commitment to the implementation of the program at Morgan now. Part time commitment will not do the job. This court expects the GISD representative in charge of this program to become an expert in magnet schools and to know everything there is to know about magnet schools.

5. GISD must immediately commence compilation of information concerning its recommendations with refer-

ence to a Tri-Ethnic Committee. GISD and this court will have a Tri-Ethnic Committee.

In recognition of the fact that GISD Board of Trustees are the elected representatives of the people, its recommendations concerning the identity of the persons on the Tri-Ethnic Committee will be given first preference, assuming that GISD cooperates and makes reasonable and sensible recommendations concerning membership on a Tri-Ethnic Committee; however, a Tri-Ethnic Committee consisting of four Mexican-Americans, four Anglo-Americans, and four Negro-Americans will be appointed to monitor and assist this court and the GISD in the goals of making Morgan the best magnet school in this region and making absolutely certain that all vestiges of the dual system are eliminated as rapidly as possible.

6. The court will, as soon as possible, enter a formal order requiring GISD to take the steps set forth herein and adding additional requirements.

This court will hold a hearing on March 21, 1977, at 1:30 p. m. at which it will require GISD to present oral testimony concerning the specific steps taken with reference to each of the above-numbered paragraphs. The court expects to hear testimony not merely from Mr. Vollert, but from those representatives and employees of the school district who have actually been doing the specific day-to-day work suggested in the above paragraphs.

By February 21, the court will also expect to receive from GISD a list of eighteen (18) names of persons who would be appropriate to serve on the GISD Tri-Ethnic Committee. This list should contain the names of six Mexican-Americans, six Anglo-Americans, and six Negro-Americans, along with a brief summary of each person's background and qualifications.

Finally, allow me to make some observations concerning our future progress and our future course of action. Hindsight is a wonderful instrument. In the light of hindsight, we are all grievously negligent. It is now easy to perceive that the hearing we held in September of 1977 should have been held immediately after the passage of the bond issue which made it possible to build the new schools. The work of making Morgan the best magnet school in this area and making certain that the opportunity afforded by the new schools was seized to eliminate every vestige of the past dual system should have been vigorously in progress since the passage of the bond issue. All of us must bear some responsibility for this delay. Certainly, I acknowledge that this court should have on its own initiated such a hearing immediately after the passage of the bond issue. I should have prepared a detailed written opinion making the court's findings more understandable immediately after the September 9 hearing. In all candor the plaintiffs and amicus must also bear some responsibility for this delay.

It must not be forgotten, however, that the law places the *primary* responsibility on the *Board*. This court is thoroughly convinced, however, that regrets about what might have been and pointing the finger of blame at ourselves or others at this stage, is going to accomplish very little. On the other hand, it seems essential that we all work together, communicate freely and candidly, without undue emphasis on the past or a challenging of each other's motives. In this connection, I must admit that when Mr. Berry at our last hearing attacked the report concerning L. A. Morgan on the basis of admittedly very limited examination, I was distressed and disappointed. On the other hand, I have now reviewed that report myself with great care, and I must state that I too, am very disappointed and understand and sympathize with Mr. Berry's disappointment. The "plan" is not really a "plan." It is a statement of a concept. This court is very hopeful that the concept is a good one and will produce effective results; however, by this time we should be doing more than producing concepts—we should be doing affirmative things to make the Morgan school the best magnet school in this region. As the

court sees it, there is no reason why the actual work of doing this could not have commenced immediately after September 9; and in fact it should have been in progress long before September 9, 1978. This court takes its full share of the responsibility for the delay, but emphasizes that the delay must end. We must all go to work, giving this project our very first priority.

I will look forward to seeking you all on March 21, and hearing the type of detailed testimony which this letter and the order which will follow envision.

Very sincerely yours,

(s) Finis E. Cowan
Finis E. Cowan
United States District Judge

ORDER OF APRIL 27, 1978

BE IT REMEMBERED that on the 21st day of April, 1978, the Court conducted a meeting of its Tri-Ethnic Committee and heard testimony from Jewel Banks and Frank Vollert. Because of testimony given at that hearing and because of recommendations made by the Tri-Ethnic Committee, the Court wishes to conduct an additional hearing to explore progress made in connection with designing and implementing a plan whereby the Morgan school will be one of the finest magnet schools in the United States, which will have the effect of attracting students of all races so as to desegregate the Morgan school and remove Morgan as a vestige of the dual system. The developments at this hearing and the advice and counsel of the Tri-Ethnic Committee lead this Court again to emphasize that the responsibility for preparing and implementing a plan that will work, that is, a plan which will desegregate the Morgan school, is the primary responsibility of the Galveston Independent School Board, and not of this Court or its Tri-Ethnic Committee.

The Court, on the basis of the hearing of April 21, is also persuaded that there is a serious lack of communication between this Court and the Galveston Independent School District Board of Trustees, and the Court therefore requests that the members of the Galveston Independent School Dis-

trict Board of Trustees attend the hearing scheduled for May 5. In order that as many of the Trustees as possible may be available to attend this hearing, the hearing will be conducted at 4:30 p. m. The Court respectfully requests the witnesses for Galveston Independent School District to be prepared to present to the Court and to the members of the Tri-Ethnic Committee a specific list of definite actions taken and which will be taken in the immediate future to implement the plan to make the Morgan school an excellent magnet school.

ENTERED and EXECUTED this the 27 day of April, 1978.